William D. PETTIT, Thomas J. Crawford and Harry Berger, as Trustees in Reorganization of the Estates of Swan-Finch Oil Corporation, Keta Gas and Oil Company and Swan-Finch Petro Chemical Corporation, Plaintiffs,

v.

AMERICAN STOCK EXCHANGE et al., Defendants.

United States District Court
S. D. New York.

March 7, 1963.

On Request for Certification
April 15, 1963.

Milbank, Tweed, Hope & Hadley, New York City, for defendants Swiss Credit Bank, Zurich, Swiss Credit Bank, New York Agency and Swiss American Corp.; William Eldred Jackson and Rebecca M. Cutler, New York City, of counsel.

Fulton, Walter & Duncombe, New York City, for defendants Edward T. McCormick and Michael E. Mooney; Hugh Fulton, George Rowe, Jr., and Lawrence W. Schilling, New York City, of counsel.

Delson & Gordon, New York City, for defendant Ira Haupt & Co.; Norman Moloshok, New York City, of counsel.

PALMIERI, District Judge.

This is a suit by trustees appointed pursuant to Chapter X of the Bankruptcy Act[1] against the American Stock Exchange (Exchange) and others for alleged complicity in larcenous acts perpetrated by Lowell Birrell with respect to the fraudulent issuance of Swan-Finch stock and its subsequent sale to the public. This suit follows a series of public revelations that were both startling in nature and widespread in effect.

In May of 1961 the Securities and Exchange Commission expelled defendants Gerard A. and Gerard F. Re from the Exchange and revoked their broker-dealer registration for violations of numerous provisions of the federal securities laws while acting as specialists for Swan-Finch and other stocks. Although the expulsion order affected only the Res, the facts submitted to the Commission indicated serious irregularities in the conduct of the other defendants as well, and soon afterward, the Commission directed its staff to investigate Exchange rules, policies, and other regulatory procedures to ascertain the adequacy of the protection they insured to the investing public. In an apparent and immediate response to the investigation, the Exchange adopted many far-reaching changes in personnel and procedure. These culminated in December of 1961 with the resignation of its President, Edward T.

George C. Levin, James V. Hallisey, New York City, for trustees.

Forsythe, McGovern & Fetzer, New York City, for defendants American Stock Exchange, Joseph F. Reilly, James R. Dyer, Charles T. Bocklet and John J. Mann; Thomas A. McGovern and Burton L. Knapp, New York City, of counsel.

1. 11 U.S.C. §§ 501, 556, 560.

McCormick, and its General Counsel, Michael E. Mooney. The SEC staff investigation lasted some eight months, and its report of January, 1962, was a severe indictment of the Exchange. The report concluded:

> "There can be little doubt that in the case of the American Stock Exchange the statutory scheme of self-regulation in the public interest has not worked out in the manner originally envisioned by Congress. The manifold and prolonged abuses of misconduct described in this report make it clear that the problem goes beyond isolated violations and amounts to a general deficiency of standards and a fundamental failure of controls." [2]

The particular facet of the massive Birrell frauds that is the subject of this action was a continuing conspiracy over a three-year period that resulted in an illegal and fraudulent distribution of 578,000 shares of Swan-Finch stock to the public. [3] Many and continuous purchases and sales were involved. At Birrell's direction, Swan-Finch issued the shares in purported exchange for valuable or equivalent consideration. In fact, the consideration was neither valuable nor equivalent, nor was it ever intended that it should be received by Swan-Finch. Consistent with his frequently repeated pattern of larceny, Birrell succeeded in abstracting valuable assets, in this case valuable stock of Swan-Finch, behind the facade of a transaction having the appearance of legality, and ultimately in leaving those imposed upon with worthless paper on their hands. To effectuate his scheme, Birrell, who retained con-

trol over the shares, had them distributed to the public through the American Stock Exchange, with the proceeds of numerous sales appropriated for his own use and benefit or for that of persons privy with him. The distribution was effected without the required registration with the SEC and was facilitated by fraudulent statements by Birrell to the effect that Swan-Finch had acquired and retained assets in return for the original issue of shares. Additional fraud is claimed to have existed in the failure of Swan-Finch since 1955 to issue shareholder's reports in order to conceal the acts mentioned above.

Vital participants in the distribution were the Res, who engaged in transactions in Swan-Finch shares far beyond the limited scope of activity allowed specialists in connection with the maintenance of a fair and orderly market. They also utilized an elaborate series of dummies, and dummy accounts with the broker and bank defendants to conceal the actual source of shares being distributed, to control the flow of stock into the market, and to create the appearance of trading activity.

The complaint of the trustees alleging the above facts and the role of defendants in the transaction has now come under severe challenge from certain defendants on these motions to dismiss, raising several issues of broad import in the interpretation of the securities statutes.

## I

The first count of the trustees' complaint is predicated on a violation by defendants of Section 10(b) of the Securities Exchange Act of 1934,[4] and Rule

---

2. Securities and Exchange Commission, Staff Report on Organization, Management, and Regulation of Conduct of Members of the American Stock Exchange 53 (1962). It should also be noted that in April of 1962 a federal grand jury in New York indicted the Res, Birrell and certain others for criminal violations of the securities laws. The distribution of Swan-Finch shares on which this action is based also formed the basis of the indictment.

3. The recital of facts here is a recital of the allegations of the complaint which must be accepted as true for purposes of this motion.

4. 15 U.S.C. § 78j. That section provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange * * *

10(b) 5 of the Securities and Exchange Commission promulgated thereunder,[5] which render unlawful fraudulent conduct in connection with the purchase or sale of a security. Defendants [6] argue initially that the trustees have no rights under Section 10(b), and hence lack standing to pursue an action based on that statute. The general thrust of defendant's position is that the trustees are in reality seeking to recover for corporate mismanagement rather than for the fraud perpetrated on Swan-Finch investors. Section 10(b), argue defendants, can be utilized only when rights in the latter rather than the former instance are asserted, and then only by the investors that have been defrauded.

■ It is of course true that irrespective of the broad language of Rule 10(b) 5, the courts have been disinclined to allow "innumerable facets of internal corporate affairs" to be included within federal question jurisdiction on the basis of a purchase or sale of securities that is only incidental to a major mismanagement issue.[7] On the other hand, that the fraud was perpetrated by insiders does not render Section 10(b) inapplicable, if the transaction represents an abuse of the securities trading process, and should properly be subject to SEC regulations for an adequate remedy.[8]

■ Application of these criteria to the present action leaves no doubt in the Court's mind that the complaint alleges a valid cause of action under Section 10(b). At the heart of this case are two fraudulent transactions in securities. By virtue of one, the initial issuance and distribution to Birrell, the corporation was defrauded of 578,000 shares of its stock, a substantial asset of the corporation. This facet of the scheme comes squarely within Section 10(b), as Hooper v. Mountain States Securities Corp.[9] makes eminently clear, and gives rise to a corporate cause of action with respect to it.[10]

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

5. 17 C.F.R. § 240.10b-5, which provides:
"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
"(a) To employ any device, scheme, or artifice to defraud.
"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."

6. Motions to dismiss the first count are here made by defendants American Stock Exchange, McCormick, Mooney, Reilly, Dyer, Bocklet, Mann, the Swiss Credit Banks and their local affiliates (hereinafter Swiss Banks), and Ira Haupt & Co.

7. See Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); Leech, Transactions in Corporate Control, 104 U.Pa.L.Rev. 725, 768, 834 (1956).

8. Leech, Transactions in Corporate Control, supra, at 835.

9. 282 F.2d 195 (5th Cir., 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), 1961 Duke L.J. 330, 59 Mich.L.Rev. 1267 (1961); 13 Stan. L.Rev. 378 (1961); 18 Wash. & Lee L. Rev. 253 (1961).

10. In Hooper the corporation was caused through fraud to issue and transfer its shares for a worthless consideration. Many of the shares were then distributed to the public. The court held that the issuance and transfer of shares by the corporation was a sale that brought the transaction within the terms of Section 10(b) irrespective of whether the corporation could be considered an "investor." The court found the requisite loss that enabled suit to be brought on the corporation's behalf in the fact that

The second illegal distribution, however, was indispensable to the successful completion of the fraud. Through the facilities of the Exchange and complicity of the other defendants, Birrell and the Res were enabled to sell the shares to the public without registration, on a rigged market, and with both the Birrell ownership and the larcenous origin of such ownership concealed from investor knowledge. Having lent themselves to such misuse, defendants may not now claim that their conduct caused harm only to investors and not to the corporation. Moreover, both transactions being one overall scheme in which the channels of interstate commerce, the mail, and the Exchange were used for fraudulent manipulation, and in which people trading in corporate securities through the Exchange facilities were damaged, defendants' effort to characterize the trustees'

claim as one of "corporate mismanagement" to which Section 10(b) would not apply is invalid and must be denied effect.

Howard v. Furst [11] does not preclude this result. It is true that there is broad language in the Howard opinion to the effect that the corporation has no rights under the Act absent a special provision giving it such rights.[12] The fact remains, however, that the case arose in the proxy area where very different considerations are relevant to determine whether the corporation should be given rights to enforce the SEC rules. At least one such consideration is that insurgents seeking to wage a proxy contest would no longer be protected from harassment by the incumbent organization that could bring suits on behalf of the corporation.[13] Even in the particular area to which it relates, the Howard

it "parted with [stock] which on its current value could have enabled [it] to acquire property of substantial value." 282 F.2d 195, at 207. See also Slavin v. Germantown Fire Ins. Co., 174 F.2d 799, 805–806 (3d Cir., 1949).

A comment on the Hooper case in 13 Stan.L.Rev. 378 (1961) makes two points of interest. First, that since the principal business of the defrauded corporation was that of a holding company, i. e., it issued its own stock in return for the stock of income-producing subsidiaries, the corporation might have been viewed as an "investor" sought to be protected by the Act. And second, that liability could have been imposed on the alternative theory that receipt of certain worthless contract rights in return for its shares constituted a purchase of "securities" to which the reach of the statute also extended. Conceivably either or both of these theories could be applicable to sustain the complaint in the instant case. The parties, however, have not urged these points and they will not be passed upon by this Court.

11. 238 F.2d 790 (2d Cir., 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L. Ed.2d 759 (1957).

12. 238 F.2d 790, at 793. But cf. Leech, Transactions in Corporate Control, supra note 7, at 831:
"The fact that no civil cause of action is given [by Section 10(b) and Rule 10(b)5] to the corporation or to share-

holders suing on its behalf should not alone serve as a barrier to judicial recognition of the corporation's claim [arising out of the transfer of control shares]. The consistent ruling that a civil remedy is available to an aggrieved selling shareholder in the event of violation of the rule is persuasive that a civil remedy may be similarly available to the corporation, but only if a transaction involving a sale of control falls within the activities proscribed by the section and rule as a substantive matter."

13. Thus, the district court opinion that was affirmed by the Court of Appeals, although without specific mention of this point, stated:
" * * * to have given a right of action to the corporation would have permitted the corporation to proceed against the distributor of anti-management proxy statements and thus have added to the hazards of members of the very class the statute was designed to protect." 140 F.Supp. 507, at 512 (S.D.N.Y.1956).
See also, Loss, Private Actions Under the Proxy Rules, 73 Harv.L.Rev. 1041, 1060–64 (1960). There the Howard decision is criticised on the grounds that the courts should maintain neutrality in proxy contests and that the legislative history recognizes that proxy rules should also protect the corporation from unscrupulous outsiders.

decision is not without its critics. Indeed, the Second Circuit has intimated that the decision is subject to reconsideration.[14] Thus, Howard v. Furst should not be held to control where the issue does not relate to corporate control, but to whether recognition of Section 10(b) rights in a corporation defrauded of its stock is outside the scheme contemplated by Congress when it passed that section.[15]

▇▇ Finally, although it is not essential to the decision on this contention, it should be noted that the elements of this case make it peculiarly appropriate for the recognition of federal rights of the corporation.[16] Although both the SEC and the Department of Justice have acted to prevent the recurrence of the abuses that took place in connection with Swan-Finch, their actions have offered little comfort to those who have allegedly suffered monetary loss at the hands of the defendants. Defendants appear to concede that investors in Swan-Finch stock may have been damaged by their acts, and that appropriate Section 10(b) liability would lie in such cases. This concession offers only a limited solution to defrauded parties, as there are serious practical obstacles to the successful prosecution of a lawsuit on behalf of an extremely large and scattered class of persons, each of whose potential recovery is limited.[17] The cause of action of the

14. In Brown v. Bullock, 294 F.2d 415 (2d Cir., 1961) (en banc) Judge Friendly, writing for the majority, characterized the proxy area as one that "bristles with difficulties," citing Howard v. Furst, 294 F.2d 415, at 418. Judge Clark, who concurred in result, put the matter in these words: "and I suspect that some day we shall have to disavow the much criticized case of Howard v. Furst * * *." Id., at 422.

15. In addition to Hooper, two district court cases have also authorized the assertion of Section 10(b) rights by the corporation. One is H. L. Green Co. v. Childree, 185 F.Supp. 95 (S.D.N.Y.1960) which without consideration of the particular point at issue here upheld an action by a corporation against certified public accountants, who allegedly prepared false statements in connection with the issuance of stock of plaintiff corporation in exchange for the stock of another company.

The second case is Taussig v. Wellington Fund, Inc., 187 F.Supp. 179 (D.Del. 1960). Plaintiffs there were minority shareholders of Wellington Fund, Inc. who alleged among other things that improper use of the name Wellington by other related companies gave a right to the corporation to sue for an asserted violation of Section 10(b). The court upheld this contention, relying expressly on the Hooper case.

16. The trustees also seem to contend that they may maintain this action for the benefit of the stockholders of Swan-Finch. Presumably, they intend to refer to all investors in Swan-Finch stock who at any material time suffered loss in their investment occasioned by the alleged wrongful acts of defendants. It is unnecessary, however, to pass on this contention in view of the conclusions stated herein.

17. Reference to Cherner v. Transitron Electronic Corp., 201 F.Supp. 934 (D. Mass.1962) is appropriate in this connection. There, the District Court refused to authorize the giving of notice by plaintiff's attorney to other investors that were allegedly defrauded by defendants' violations of the Securities Act of 1933. The Court summarized the grounds for plaintiff's request:

"Not to allow [plaintiff's counsel] to act for all who have suffered, he claims, will mean that he can hardly effectively act even for the suffering plaintiffs who have sought his aid. Those who already have come to him for assistance have limited potential recoveries, and presumably limited funds for vindicating their rights. Unless they, or their representative, can call to their aid at an early stage other alleged victims who will combine their resources with his initial clients, counsel will not have at his disposal financial resources for the effective prosecution of the claims of his original clients. Lacking outside resources, he will either be forced to abandon their allegedly meritorious claims or will be in an unequal battle with a supposititiously wicked wrongdoer." (at 936–937)

but primarily on the basis of the policy against the stirring up of litigation, refused to grant the requested authorization, or plaintiff's motion for discovery and inspection of documents that could

corporation could, of course, be prosecuted without the benefits extended by the SEC Act. However, the procedural and jurisdictional difficulties in connection with such an action would be many,[18] and could easily frustrate effective recovery by the bankrupt estate. In view of these facts, it is clear that the inclusion of this cause of action within Section 10(b) represents a warranted exercise of federal jurisdiction in an effort to accomplish what Congress intended—the protection of the integrity of stock transactions.[19]

The second contention of the moving defendants with respect to Section 10 (b) is that the trustees cannot and do not allege that defendants' conduct, however else it may be characterized, was fraudulent; and that absent fraud on defendants' part, no liability under Section 10(b) can attach. Clearly, the trustees intend to allege fraud. In addition to a general allegation of conspiracy among all the defendants, the trustees claim that defendant Exchange and its officers aided, abetted, and assisted the illegal distribution of Swan-Finch stock by failing to take necessary disciplinary action against abusive conduct and practices of which they knew or should have known. Defendant Ira Haupt & Co. is accused of having assisted, aided, and abetted the Birrell conspiracy by permitting the Res to open and maintain dummy accounts. The Swiss Bank defendants are accused of similar conduct with respect to their banking facilities, and also of having assisted the concealment of the true identity of traders in Swan-Finch stock, and having aided the sale and delivery of unregistered Swan-Finch stock. The trustees have also made additional explicit reference to Government proceedings claimed to lend support to their allegations.

■ Since knowing assistance of or participation in a fraudulent scheme under Section 10(b) gives rise to liability equal to that of the perpetrators themselves,[20] the facts alleged by the trustees, if proven, would permit recovery under Section 10(b). Defendants claim, however, that the trustees have not complied with Rule 9(b), Fed.R.Civ.P., which requires that the circumstances constituting fraud be stated with particularity in the complaint. Assuming that Rule 9(b) is applicable where, as here, the claim is based on a federal statute, a proposition that is not at all clear,[21] and considering the complaint as a whole, the Court concludes that defendants have been adequately apprised of what conduct of theirs, at least initially, is claimed to constitute participation in the scheme to defraud.[22] Under present federal

---

have enabled him to discover the identity of other defrauded investors.

18. See Hooper v. Mountain States Securities Corp., supra note 9, 282 F.2d at 201.

19. See Taussig v. Wellington Fund, Inc., supra note 15, 187 F.Supp. at 219:
"In the present context, federal statutory remedies accorded by implication must be held to extend to persons other than the investing public in certain compelling instances. To begin with, in particular circumstances the investors' interest is peculiarly served by according remedial rights by implication to persons other than investors. The administrative agency exercising appropriate discretion may decide not to institute the required action to protect the injured litigants' interests. Further, there may be no remedy conferred by State law, or in the case of

an enterprise engaged in multi-state activities, local relief may be entirely inadequate. The crux of the matter is, plaintiffs are not acting as private attorneys general, or as a special representative of the Commission. Plaintiffs are in Court in an attempt to vindicate the rights and protections which they claim are secured to Wellington Fund by virtue of federal law."

20. Securities and Exchange Commission v. Scott Taylor & Co., 183 F.Supp. 904, 909 n. 12 (S.D.N.Y.1959), Loss, Securities Regulation 846 n. 119 (1951).

21. See Subin v. Goldsmith, 224 F.2d 753, 766 (2d Cir.), cert. denied, 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779 (1955) (dissenting opinion of Frank, J.).

22. The trustees do not seem to have alleged the particular facts upon which they base their claim of knowing participa-

practice, with its clear insistence against technicality at the pleading stage, and its emphasis on the many discovery procedures by which genuine issues may be formulated,[23] this is sufficient.

## II

■■ Count 2 of the trustees' complaint arises under Section 6 of the Securities Exchange Act,[24] which placed upon the Exchange defendant,[25] as a condition of registration as a national exchange, the adoption and enforcement [26] of just and equitable principles of trade. The trustees contend that had the Exchange properly carried out the obligation imposed by Section 6, that Birrell and the other conspirators could not have accomplished their scheme. The Exchange argues, as it did in the case of the first count, that the statute is designed solely to protect investors and therefore cannot be utilized to vindicate rights of the corporation that stem primarily from mismanagement of insiders. As in the case of Section 10 (b), however, the statutory scheme should not be so restricted where, as here, the loss to the corporation arises. from a fraudulent transaction in its securities which is successfully perpetrated through the conduct of the Exchange.

The Exchange also argues that liability arises only when it has notice of the violations of its members. Concededly, in Baird v. Franklin,[27] the leading case on the obligations created by Section 6, and a case on which both the trustees and the Exchange rely, it appears that the officials of the New York Stock Exchange had knowledge of violations of its rules that they then failed to enforce. However, neither Judge Augustus Hand, writing for himself and Judge Swan, nor Judge Clark, in dissent, were willing to restrict Section 6 liability to cases of actual knowledge. Thus, directly at the outset of the opinion, Judge Hand states:

> "We accede to the view that the Stock Exchange violated a duty when it failed to take disciplinary action against Richard Whitney on November 24, 1937, after there was reason to believe that the latter had converted the plaintiffs' securities." [28]

He then continues:

> "In the case of the Exchange there was no duty except to investigate the dealings and the financial conditions of the members * * * who it had reason to believe had been guilty of conduct inconsistent with just and equitable principles of trade." [29]

Moreover, in a lengthy "dissent," that also represented the opinion of the court except on the question of whether plaintiffs' damages were caused by defendant's breach, Judge Clark, in at least three places, expressly predicates liability on the fact that the Exchange had known "or had reasonable cause to suspect" that its rules were being violated.

These statements clearly recognize a cause of action for a negligent violation

---

tion, but Rule 9(b) specifically provides that "Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

As to the contention of the Exchange that the phrase "knew or should have known" is not sufficient to charge it with knowledge, see Rule 8(e) (2):

"A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. * * * *"

23. See Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir., 1957).

24. 15 U.S.C. § 78f.

25. This count obviously is asserted only against the Exchange.

26. See Baird v. Franklin, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S. Ct. 38, 89 L.Ed. 591 (1944).

27. See note 26, supra.

28. 141 F.2d 238, at 239.

29. Ibid.

of Section 6, a cause sufficiently alleged by the trustees.[30]

### III

■ The third count of the complaint alleges simply that the defendants converted the shares of Swan-Finch stock and are liable in damages. The trustees are here making practical utilization of Form 11, appended to the Federal Rules of Civil Procedure, which illustrates the pleading of a cause of action for conversion by the statement that defendant converted some specific property of plaintiff. In the face of the apparent authority of Form 11 for the trustees' terseness, and since on this motion no facts are before the Court that contradict the ultimate fact of conversion urged by the trustees, the motion to dismiss as to this count [31] must be denied.[32]

### IV

In count IV the trustees allege that the Res, as part of their plan to publicly distribute large amounts of unregistered stock, purchased securities in the fictitious names of Jose and Gerardo Mirando. These purchases and subsequent distribution to the public on the Exchange were made through the facilities of the Swiss Banks, which allegedly had full knowledge of the illegal nature of the transactions, and which are now purported to hold the proceeds from the illegal conspiracy for the benefit of the Res.[33]

■ The trustees base their right to recover damages from the Swiss Banks, and in the interim to obtain a temporary injunction against transfer of the proceeds of the stock sales, on Section 70, sub. e. of the Bankruptcy Act.[34] That section provides in substance that a transfer made or suffered by the debtor that under applicable state or federal law is fraudulent or voidable as against any creditor, is null and void as against the trustee. Here, evidently, the transfer relied upon is the illegal distribution of 578,000 shares of Swan-Finch stock to Birrell, a transfer "suffered by" the corporation and therefore one to which Section 70, sub. e. applies whether it was voluntary or involuntary, and whether perpetrated by corporate management or by outsiders.[35]

■ The trustees next must show that the transfer under any federal or state law applicable thereto, "is fraudulent as against, or voidable for any other reason by any creditor." Here, the trustees invoke Article 10 of the Debtor and

30. That the first count of the complaint rests on knowledge of the fraud imputed to the Exchange, while the second appears to allege only negligence is immaterial at this stage of the action. See Rule 8(e) (2):
"A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or on equitable grounds or on both."

31. All of the defendants who moved to dismiss with respect to the first count, see note 6 supra, have also moved with respect to count III, with the exception of defendants McCormick and Mooney.

32. In connection with the validity of this cause of action, see 1 Harper & James, The Law of Torts § 2.13, at 142 (1956):
"Any fraudulent scheme whereby plaintiff is induced to part with the possession of his goods in consummation of a sale, pledge, or other transaction constitutes a conversion. * * *"

See also Pierpoint v. Hoyt, 260 N.Y. 26, 182 N.E. 235 (1932) ("the courts long since came to treat a willful and wrongful taking and disposal of stock certificates as a conversion of the property itself"); Passaic Falls Throwing Co. v. Villeneuve-Pohl Corp., 169 App.Div. 727, 155 N.Y.S. 669 (1st Dep't 1915) ("Every person is liable who personally or by agent commits an act of conversion, or who participates by instigating, aiding, or assisting another").

33. As count II is asserted only against the Exchange, so also count IV is apparently asserted only against the Swiss Bank defendants.

34. 11 U.S.C. § 110, sub. e.

35. See Eisenrod v. Utley, 211 F.2d 678 (9th Cir., 1954); Warner v. Dworsky, 194 F.2d 277 (8th Cir.), cert. denied, 343 U.S. 985, 72 S.Ct. 1060, 96 L.Ed. 1362 (1952).

Creditor Law of New York, McKinney's Consol.Laws, c. 12, apparently placing particular reliance on Section 276 thereof. This section provides that:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

The illegal transfer of the shares to Birrell would come within this section, since the siphoning off of a corporation's assets by insiders constitutes a transaction in fraud of creditors of the corporation.[36]

 A transfer of property of the debtor having occurred, and the transfer being fraudulent as to creditors under state law, the trustees are entitled to pursue the shares or the proceeds thereof against any holder who lacks the status of a valid transferee.[37] Surely, on the allegations of the complaint, which must be accepted as true, the Swiss Bank defendants cannot lay claim to such status, and thus have no immunity from an action to recover the proceeds from the sale of property of which the corporation has been defrauded.

The Court concludes, then, that the trustees' complaint is valid, and the motions to dismiss must be denied. And it is perhaps not inappropriate to paraphrase the essence of this Court's holding with the following passage from Hooper v. Mountain States Securities Corp.:

"Even in our remote position, we would be blind to all we hear and read about were we to succumb to the artificial contention that the issuance of this stock made the corporation no poorer so that the only persons who suffered were the stockholders for whom the suit cannot be brought by the Trustee. * * * If—as we very much doubt—accountants would support any such contention as a consequence of the esoteric mysteries of the double entry system * * * the law with its eye on reality would have to part company with such purists."[38]

Submit order on notice.

## On Request for Certification.

 Defendants have requested the Court to authorize an interlocutory appeal[1] from the denial of their motions to dismiss plaintiffs' complaint.[2]

There is no doubt that the complaint in this case raises significant and, to a large extent, novel issues with respect to the scope of liability under the Securities Exchange Act. Moreover, such issues are of concern to many aspects of the securities business and to the investing public. On this premise, early appellate review would seem desirable.

In spite of this, however, the Court has concluded that an interlocutory appeal should not be certified.

One important issue in this action is whether a corporate issuer may assert a claim for violation of Sections 10(b) and 6(b) of the SEC Act. Defendants rested their contention that the corpo-

---

36. See Rosof v. Roth, 169 F.Supp. 707 (S. D.N.Y. 1957), aff'd, 262 F.2d 829 (2d Cir., 1959); Eisenrod v. Utley, supra; Ryan v. Jones, 92 F.Supp. 308 (E.D.Pa. 1950); Williams v. Brownstein, 1 F.2d 470 (D.Me.1924).

37. Section 70, sub. e(2), 11 U.S.C. § 110, sub. e(2). 4 Collier, Bankruptcy, § 70.-92[5], at 1760 (14th ed. 1962); Gray v. Breslof, 273 F. 526 (E.D.N.Y.1921).

38. 282 F.2d 195, at 203.

1. 28 U.S.C. § 1292(b):
 "When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order."

2. See opinion of this Court dated March 7. 1963.

ration had no such rights on Howard v. Furst,[3] arguing that Hooper v. Mountain States Securities Corp.,[4] which is to the contrary, should not be followed. Since this issue appears to be a "controlling question of law" envisaged by the interlocutory appeal statute, its presentation to the Court of Appeals could conceivably be proper at this preliminary stage of the litigation.[5] In Brown v. Bullock,[6] however, the Court of Appeals specifically indicated the inappropriateness of review of the problems in the proxy area to which Howard v. Furst relates when only the allegations of a complaint were before it. The Court stated that such problems "had better be resolved * * * with the fuller development of the facts that will come from a trial."[7] This statement applies with even greater force against certification here, since this case presents the additional difficulty of the validity and application of the Howard decision outside of the proxy area.[8]

Other issues of substantial importance are whether defendants' conduct was fraudulent within the intendment of Section 10(b), and whether such conduct resulted in injury to the corporation for which it can sue under that section. It must be reiterated, however, that these issues arose in the framework of whether the trustees' allegations, read in the light of present attitudes towards the function of pleadings, were sufficient to withstand a motion to dismiss. In holding that dismissal would be improper, this Court did not purport to pass on whether the trustees could sustain their allegations, or whether, when the complete details of this transaction were known, the trustees' legal premises would remain valid.

Appellate review cannot be meaningful in this context. Defendants would be seeking the final resolution of difficult substantive questions in a complex factual setting with no more than the bare allegations of the complaint to define the controversy. It is likely that important facts will be developed beyond the present confines of the pleadings, that might have a vital impact on the court's assessment of the issues. Review at this juncture is made even less significant by the fact that the issues to be certified necessarily involve questions of pleading, and application of the firmly established rule in this Circuit against dismissals of actions on the basis of the complaint.[9]

3. 238 F.2d 790 (2d Cir., 1956), cert. denied, 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759 (1957).

4. 282 F.2d 195 (5th Cir., 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L. Ed.2d 693 (1961).

5. Indeed, it is this question that this Court had in mind when it indicated a disposition on oral argument to certify an interlocutory appeal.

6. 294 F.2d 415 (2d Cir., 1961).

7. 294 F.2d 415, at 418. Since the court sustained federal jurisdiction on other grounds, resolution of the proxy controversy was also stated to be unnecessary at that time. The import of the court's opinion is clear, however, to the effect that where a trial is otherwise in prospect, development of the facts should precede appellate resolution of the Howard v. Furst issue.

8. It is highly unlikely that the Court of Appeals would accept Hooper v. Mountain States Securities Corp., supra, to the extent that it allows a corporation to sue for certain violations of the SEC Act, while rejecting the validity of that premise as applied to the specific facts there presented. And, since approval of the Hooper case on its facts would necessarily result in the rejection of defendants' claim that the present action is for mismanagement rather than fraud in securities, this issue is closely related to the first issue discussed above, and as such not properly certifiable.

9. See, in these respects, Gottesman v. Gen. Motors Corp., 268 F.2d 194, 196 (2d Cir., 1959):
 "It would seem axiomatic that appeals challenging pre-trial rulings upholding pleadings against demurrer could not be effective in bringing nearer the termination of litigation; on the contrary, they only stimulate the parties to more and greater pre-trial sparring apart from the merits. * * * [A] reversal at most could lead only to a remand for repleading, with possibilities of further interlocutory appeals thereafter."
 Brown v. Bullock, supra note 5, 294 F.2d at 423, 425 (dissenting opinion of Moore,

The Court concludes, then, that the significance of the issues in this case notwithstanding, an interlocutory appeal is not proper in the circumstances here presented.[10] In the light of the lesson to be drawn from the language of the Court of Appeals in the cases hereinabove discussed, this case commends itself to a greater exploration of the facts in advance of any appellate review.

An order is filed herewith directing defendants to answer the complaint.

J.: "I would grant the motion to dismiss with leave to serve an amended complaint alleging facts showing federal jurisdiction and violations of the [Investment Company] Act."). Compare Nagler v. Admiral Corp., 144 F.Supp. 772 (S.D.N.Y. 1956), with id., 248 F.2d 319 (2d Cir., 1957). See also Kroch v. Texas Co., 167 F.Supp. 947, 949 (S.D.N.Y.1958).

10. Although it has not been urged that an interlocutory appeal would be justified solely for purposes of review of the fourth cause of action, reference has been made by the Swiss Bank defendants to Siegel v. Municipal Capital Corp., 102 F.2d 905 (2d Cir., 1939), that is claimed to hold that Section 70, sub. e of the Bankruptcy Act would not encompass an involuntary transfer of corporate assets. It appears that the Siegel case was decided on the basis of the earlier statutory language, that included only a "trans-

fer by the bankrupt of [his] property," and which in its present form includes "A transfer made or suffered * * * by a debtor." See also Warner v. Dworsky, 91 F.Supp. 884 (D.Minn.1950), 98 F.Supp. 466, 468 (D.Minn.1951), distinguishing the Siegel decision on such grounds. The clear weight of authority that has interpreted the present statute indicates that an involuntary transfer of corporate assets is within the section, see 4 Collier, Bankruptcy, § 70.71 n. 1, at 1528–29 (14th ed. 1962), and, indeed, in recent cases involving such transfers, the contrary has apparently not even been urged. See Rosof v. Roth, 169 F.Supp. 707 (S.D.N.Y.1957); id., 262 F.2d 829 (2d Cir., 1959); Field v. Lew, 184 F. Supp. 23 (E.D.N.Y.1960), aff'd sub nom. Field v. Bankers Trust Co., 296 F.2d 109 (2d Cir., 1961); cert. denied, 369 U.S. 859, 82 S.Ct. 948, 8 L.Ed.2d 17 (1962).