Stephen **FISCHER** et al., Plaintiffs,

v.

Michael **KLETZ** et al., Defendants (and fifteen other actions consolidated therewith).

Valentine and Norton **BLOCH** et al., Plaintiffs,

v.

Kenneth B. **KEATING** et al., Defendants.

United States District Court
S. D. New York.

Jan. 13, 1966.

Lynton, Klein, Opton & Saslow, New York City, for defendant Michael Kletz.

Turk, Marsh, Kelly & Hoare and Zelby & Burstein, New York City, for defendants Benjamin Eskow, Gerald W. Eskow and Burton Eskow.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Peat, Marwick Mitchell & Co.

Pomerantz, Levy, Haudek & Block, Irving Bizar, and Weinstein & Levinson, Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiffs.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants Eastman Dillon, Union Securities & Co., Hornblower & Weeks-Hemphill Noyes and D. Frederick Barton.

TYLER, District Judge.

Certain defendants in these consolidated representative actions move to dismiss the amended complaints pursuant to Rule 12(b), F.R.Civ.P. or, in the alternative, to stay these actions pending reference for resolution of certain factual issues to the Interstate Commerce Commission ("ICC"). For reasons to be indicated hereinafter, these several motions are denied in their entirety.

Plaintiffs are or were owners of shares of capital stock or debentures of Yale Express System, Inc. ("Yale"), which corporation, along with its subsidiaries, has been in reorganization in this court under Chapter X of the Bankruptcy Act since May, 1965. The moving defendants are Peat, Marwick, Mitchell & Co. ("PMM"), formerly the public accountants for Yale, and some of the former directors and officers of Yale. In the summer and fall of 1965, plaintiffs filed some 17 representative actions seeking to recover damages from the defendants. The various complaints are said to be based upon Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) to enforce liabilities said to arise by virtue of the provisions of Section 10(b) of the 1934 Act (15 U.S.C. § 78j(b)); Securities and Exchange Commission ("SEC") Rule 10–b–5 and Section 13 of the 1934 Act (15 U.S.C. § 78m); Sections 12, 15 and 17(a) of the Securities

Act of 1933 (15 U.S.C. §§ 77*l*, 77*o*, and 77q(a)); Sections 8, 20(a), 202 and 214 of the Interstate Commerce Act (49 U.S.C. §§ 8, 20(a), 302 and 314); and principles of common law. More particularly, the essential allegations of the complaint are to the effect that on August 20, 1963, Yale's officers and directors caused to be issued a prospectus in connection with the proposed sale to the public of debentures. Previously in the year 1963 and thereafter continuing into 1964, Yale, its securities then listed on the New York and American Stock Exchanges, caused the usual earning statements and forecasts for stated periods to be disseminated to the public and filed with the SEC, the ICC and the stock exchanges. Essentially, the complaints allege that these two categories of statements or information, i. e. the prospectus and the earning statements, were false and misleading.[1] Thus, the defendants are charged with negligence and at least constructive fraud in the preparation and dissemination of these two categories of documents.

Those of the defendants who bring the present motion urge in effect that these essential allegations heretofore summarized present unusual and intricate problems of compliance or non-compliance with the peculiar accounting requirements for a registered motor carrier such as Yale imposed by the ICC—and that thus this court should either dismiss the cases or stay its hand until the ICC has an opportunity to exercise jurisdiction in the matter. It is true, of course, that Yale, as a registered motor carrier, was obliged to and did obtain approval of the ICC before obtaining the new public financing on or after August 20, 1963. From this initial point, defendants argue that this court should stay these actions under the doctrine of primary jurisdiction in order to permit the ICC to hold hearings and "determine the basic issues raised in the consolidated amended complaints".

█ To clear away the underbrush, it is at once apparent that the motions to dismiss the actions are without merit and must be denied out of hand. The moving defendants cannot and do not seriously argue that the ICC is empowered to grant the relief requested in the complaints. Indeed, they do not advance any arguments other than those substantially advanced in support of their application for a stay. Thus, even they must concede that there is no colorable ground for dismissal pursuant to Rule 12(b).

█ Several defendants make one other argument which must be disposed of in a summary fashion. Pointing to Section 20a(11) of the Interstate Commerce Act which provides in part that securities issued by a regulated carrier without authorization by the ICC are void, these defendants apparently urge that if, as the complaints imply, Yale filed false information with the ICC in order to obtain such statutorily required authorization, then the ICC has the power to revoke its order, thereby voiding the securities and removing plaintiffs' status as holders of Yale securities. To say the least, this ingenious argument proves too much, and it is not surprising that counsel cite no authority for this position. In any event, the ICC in fact issued an order on August 12, 1963 authorizing Yale's issuance of the securities in question. Thus, it would appear that there has been literal compliance with Section 20 a(11). Moreover, it is obvious that millions of dollars worth of Yale securities were sold through the American and New York Stock Exchanges in hundreds, if not thousands, of transactions on and after August 20, 1963.[2] Thus, even as-

---

1. More particularly, it is asserted that the prospectus overstated income for the first six months of 1963 and accounts receivable as set forth in the consolidated balance sheets of June 30, 1963. Further, it is alleged that the statements contained inflated forecasts of earnings and inflated recitals of previous earnings.

2. On August 20, 1963, Yale's securities were listed on the American Stock Exchange. Yale was listed on the New York Stock Exchange in December, 1963, and the debentures were specifically listed on that exchange for the first time in February, 1964.

suming that the ICC under these circumstances and at this late date would have the power to declare Yale's securities void, it cannot be conceived that the ICC would exercise such power or, if it did, that such exercise would have the legal result of cutting off plaintiffs' statutory and common law remedies in the courts.[3]

There is left for consideration the moving defendants most significant contention—that of the primary jurisdiction. In order to appreciate the full significance of defendant's arguments of primary jurisdiction and why it is that this court concludes that such arguments have no merit, some additional facts from the face of the pleadings and the affidavits should be summarized.

The various complaints in these actions essentially rely upon and refer to financial statements and reports prepared by or at the instance of Yale in accordance with generally accepted accounting principles rather than by accounting procedures and principles demanded by the ICC under its rules. PMM's certificates of Yale's published financial reports or statements in 1963 and 1964 and its certifications of the financial statements in the August 20, 1963 prospectus purport to be based upon "generally accepted accounting principles". Concededly, Yale had the option, despite the statutory necessity of prior ICC approval for its financing arrangements, of reporting to the investing public on the basis of such principles and elected to do so, largely, no doubt, because the two stock exchanges required the listing applications of Yale to use financial statements prepared in such a manner. Indeed, as is well known, the New York Stock Exchange requires that companies listing securities with that exchange must make financial statements to its shareholders in the same form as the statements contained in their listing applications.

In a somewhat similar vein, it is important to note that both the suits brought by the debenture holders and those brought by the stockholders center very largely upon allegations dealing with contemporaneous financial statements showing substantial profits and income for the year 1963, which profits were later adjusted and restated in May of 1965 to constitute a loss of over $5,000,000 on a pre-tax basis. According to reports thereon issued by defendant PMM, these adjustments had to do with write-offs of uncollectible receivables, transportation costs and other expenses, additional funds for loss, injury and damage claims which had to be paid and sundry other adjustments. A mere recitation of these matters suggests that neither the original financial statements for the year 1963 nor the later readjustment figures released by PMM in May, 1965 are based on anything other than general accounting principles. In short, there would appear to be no critical relevance in this case of those admittedly special and peculiar accounting principles required by ICC of registered motor carriers.

It has already been hinted (supra at page 541) that the moving defendants are notably imprecise in delineating what action or proceedings the ICC should undertake on a reference by this court to it of the accounting and fraud issues. Moreover, it may be of some significance that on October 22, 1965 the ICC issued a press release to the effect that its staff had completed an audit of the 1963 and 1964 books of account and other records of Yale and its subsidiary companies. It was further stated in this press release that, "the results of that audit, along with certain recommendations, are being forwarded today to the Department of Justice". The ICC also indicated in its release that the information developed by its staff during its investigation and its recommendations to the Justice Department are confidential.

Although their detached arguments in support of their application to stay these suits in this court pending resolution by the ICC of certain fact issues are not

---

**3.** Interestingly, Section 20a(11) by its terms permits a *bona fide* purchaser for value of a void security to sue for damages in any court of competent jurisdiction.

clear, the moving defendants appear to rely mainly upon two contentions. First, it is said that since the ICC was obliged by law to approve Yale's 1963 financing, that agency should be permitted to decide, at least initially, whether or not the various statements were false. Second, it is asserted that only the ICC has the requisite expertise to decide this central issue and any corollary questions.

Conceding that the concept of administrative expertise does or can constitute a minor ingredient in the judge-made broth of primary jurisdiction, it is by no means as important as defendants suggest. The principal part of the mix is the sensible recognition of the need for orderly and reasonable coordination of the courts and administrative agencies. 3 Davis on Administrative Law 5 (1958 Edition); see Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Moreover, defendants' submission of an affidavit of an accountant with special ICC experience describing certain specialized ICC accounting concepts is largely beside the point in that these concepts do not go to the heart of the issues raised by the complaints.

Such issues from time immemorial have been passed upon by the courts. It may be that the questions of whether or not the books, records, statements and prospectus of Yale were negligently or fraudulently prepared will raise intricate and difficult accounting problems for resolution by the court. But these are and have been typical problems in this and other courts for years; possible difficulty of their resolution, of course, is no bar to their determination here. See, generally, River Plate and Brazil Conferences v. Pressed Steel Car Company, 227 F.2d 60, 63 (2d Cir. 1955).

Moreover, the ICC has publicly stated that it has completed an investigation of Yale's books of account and related records for the critical years of 1963 and 1964. Its findings have been submitted to the Attorney General who presumably is in the process of considering appropriate civil or criminal action. At least for the foreseeable future, the ICC has proclaimed its findings to be confidential. Particularly under these circumstances, it is difficult, if not impossible, for this court to sensibly infer that orderly accommodation of the ICC's powers and jurisdiction requires a reference now or later of the major issues of these stockholders' suits to that agency.

To view the problem from another vantage point, it is evident from what has already been said that plaintiffs' complaints are based primarily upon Section 10(b) of the Securities Exchange Act of 1934, Rule 10–b–5 promulgated by the SEC thereunder and common law principles. In short, the references in the complaints to other sections of the 1934 Act, the Securities Act of 1933 and the Interstate Commerce Act, as a practical matter, may be said to be "icing on the cake". In blunt terms, as one of plaintiffs' counsel puts it, these are suits to recover damages for the fraudulent sales of securities essentially in derogation of Section 10(b) of the 1934 Act and Rule 10–b–5. In this context, if moving defendants are correct, the ICC and not the SEC would have the preeminent role in regulation of proxy statements, earnings statements and other reports required under the 1933 and 1934 Acts. Similarly, if defendants' arguments are carried to their ultimate conclusion, the myriad authorities in this and other federal courts permitting vindication of private rights under Section 10 and Rule 10–b–5 without prior reference or resort to an administrative agency—presumably the SEC—would have to be regarded as suspect. Cochran v. Channing Corp., 211 F.Supp. 239, S.D.N.Y.1962; Pettit v. American Stock Exchange, 217 F.Supp. 21, S.D.N.Y. 1963; Hooper v. Mountain States Securities Corp., 282 F.2d 195, 5th Cir. 1960, cert. den. 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); see also J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Mere recital of these propositions is sufficient to indicate their untenability.

■ To summarize, we do not have here a case involving transportation rates.

practices, trackage agreements, routing practices and similar matters clearly within the jurisdiction and expertise of the ICC. E. g. Thompson v. Texas-Mexican Railway, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946). Moreover, the litigants and the court have been put on notice that the ICC has already conducted an investigation into Yale's financial reporting and practices for the relevant years of 1963 and 1964 and has forwarded its confidential report thereof to the Department of Justice. Finally, and perhaps most significant, we do have a case which essentially is a typical claim for damages based upon sales of securities as a result of alleged fake and fraudulent statements. Under such circumstances, it cannot be reasonably inferred that the ICC can make meaningful contributions to the solutions of the problems posed by this litigation. See 3 Davis on Administrative Law 53 (1958 Ed.). Indeed, the relevant factors here suggest that it would be an abuse of judicial discretion to refer the issues of these cases to any administrative agency for resolution.

The motions are dismissed in all respects. It is so ordered.