Stanley **BRIGHT**, III

v.

**PHILADELPHIA–BALTIMORE–WASH-
INGTON STOCK EXCHANGE et al.**

**Civ. A. No. 71–433.**

United States District Court,
E. D. Pennsylvania.

May 11, 1971.

---

Morris R. Brooke, Joseph C. Bright, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

Raymond J. Bradley, Matthew J. Siembieda, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendants.

## OPINION

HUYETT, District Judge.

Plaintiff, Stanley Bright, III, by complaint filed February 22, 1971, commenced this action against the Philadelphia-Baltimore-Washington Stock Exchange ("PBW"), and the individual members of its Board of Governors ("Board"). Plaintiff claims that defendants violated a duty created by the Securities Exchange Act of 1934, as amended ("Act"), 15 U.S.C. § 78a et seq., by their failure to comply with the provisions of the PBW constitution.

Plaintiff averred that defendants violated the provisions of the PBW constitution by indicating on ballots prepared for the PBW annual election that nine, rather than ten, vacancies of members of the Board were to be filed at the election. The ballot contained the names of ten persons, including plaintiff, nominated for the office of member of the Board. Plaintiff sought a Temporary Restraining Order enjoining the annual election of PBW scheduled for March 1, 1971. A hearing was held in open court on February 23, 1971, and the request for a Temporary Restraining Order was denied.

The annual election of PBW was held on March 1, 1971. Plaintiff received less votes than any other nominee and was not certified as an elected member of the Board.

Plaintiff then on March 15, 1971 filed an amended complaint requesting a declaratory judgment providing that:

1. Ten, rather than nine, persons were elected as members of the Board of PBW at the annual election of March 1, 1971; and

2. Plaintiff was elected to the Board at the annual election of March 1, 1971 for a three-year term.

Alternatively, plaintiff requests a declaratory judgment to invalidate the annual election, to supervise the printing and distribution of proper ballots and to conduct a proper election, and that the Court retain jurisdiction and grant plaintiff such further relief as may be appropriate. Plaintiff also seeks an award of costs and reasonable attorney's fee.

### I.

The parties have agreed that all relevant testimony was produced at the February 23, 1971 hearing. Considering the evidence presented at the hearing, the pleadings, and affidavits, we make the following findings of fact.

1. Plaintiff, Stanley Bright, III, is a member of PBW who sought election to its Board.

2. Defendant, PBW, is an association registered as a national securities exchange under Section 6 of the Act, 15 U.S.C. § 78f.

3. Defendants, Thomas W. L. Cameron and Elkins Wetherill, are the Chair-

man of the Board and President of PBW, respectively. All other defendants are members of the Board of PBW.

4. The constitution of PBW provides for the composition of the Board in Article II, Section 1, as follows:

"The government of the Exchange shall be vested in a Board of Governors consisting of the Chairman of the Board of Governors, the Vice-Chairman of the Board of Governors, the President of the Exchange, twenty-four others elected to the office of Governor and the immediate past Chairman of the Board of Governors who upon the expiration of the term to which he was elected, shall be an ex officio member of the Board of Governors for a term of one year * * *."

5. Article II, Section 2, of the constitution provides that the Chairman and Vice-Chairman of the Board each shall be elected by the membership of PBW annually to hold office for a term of one year, or until his successor is elected and qualified. Under Article V, Section 3, if a vacancy occurs in the office of Vice-Chairman, the Board shall elect a successor to serve until the next annual election.

6. Article II, Section 3, of the constitution provides that the twenty-four "others" elected to the Board shall be divided into three classes of eight each.

" * * * One class shall be elected by the membership of the Exchange each year to serve for three years or until their successors are elected and qualify."

7. Under Article III, Section 14, of the constitution, vacancies in the Board are to be filled by the Board by election, the person so elected to serve until the next annual election of PBW.

8. Article X, Section 1, of the constitution provides for the annual election of governors as follows:

"The annual election of the Exchange shall be held on the first Monday in March in each year. At such annual election there shall be elected, by ballot, a Chairman of the Board of Governors and a Vice-Chairman of the Board of Governors for a term of one year each, eight Governors for the term of three years, and also Governors to fill any vacancies in the Board of Governors which may have occurred during the preceding year. In any election of Governors, due regard shall be given to the provisions of Article II, Section 1 of the Constitution of the Exchange with respect to the composition of the Board of Governors of the Exchange.

"The term of office of persons so elected shall commence at 3:45 P.M. on the Third Wednesday of March after the date of their election."

9. Article X, Sections 3 and 4, provides for a nominating committee, appointed by the Chairman of the Board with the approval of the Board, which shall receive nominations for positions on the Board to be filled at the next annual election of the Exchange and which shall report to the Secretary of PBW, in writing by the first Monday of February, its nominees for such positions.

10. Under Article X, Section 5, of the constitution, independent nominations for membership on the Board may be made by written petition, signed by not less than ten members of PBW.

11. Article XII, Section 1, of the constitution provides for appeals to the Board from a decision of a standing committee by a member of PBW interested therein if he files a written notice of appeal with the Secretary of PBW within ten days after the decision has been rendered.

12. On March 7, 1970, George DeB. Bell, a governor of the class of 1972, was elected Vice-Chairman of the Board, and Allen Weintraub was elected governor by the Board to fill the vacancy created by the elevation of Bell.

13. It is undisputed that Weintraub was elected to serve only until the annual election held on March 1, 1971.

14. It is also undisputed that eight governors of the class of 1974 were to be elected on March 1, 1971.

15. On December 21, 1970, Bell sent a letter to Wetherill tendering his resignation as Vice-Chairman of the Board, apparently to take effect on December 31, 1970.

16. Sometime shortly after January 1, 1971, Wetherill discussed with two or three other members of the Board what should be done concerning the selection of someone to fill the vacancy in the office of Vice-Chairman created by the resignation of Bell. Wetherill then approached S. Grey Dayton Jr. and talked to him about his assumption of the position of Vice-Chairman.

17. The Board at a meeting on January 20, 1971, unanimously accepted Bell's resignation as Vice-Chairman and unanimously elected Dayton to serve as Vice-Chairman until the next annual election of PBW on March 1, 1971. Dayton had consented to serve as Vice-Chairman.

18. In accordance with the constitution of PBW, a nominating committee, headed by George E. Snyder, Jr., was appointed sometime before January 12, 1971 to consider nominations for positions to be filled at the election to be held on March 1, 1971.

19. The nominating committee first met on January 12, 1971, eight days prior to Dayton's elevation to the office of Vice-Chairman and held subsequent meetings on January 21 and 28, 1971.

20. Snyder, chairman of the nominating committee, did not learn that Dayton was elevated to the office of Vice-Chairman of the Board until after the nominating committee submitted its slate of candidates for the Board on February 1, 1971.

21. In the course of its meetings, the nominating committee considered various persons whose names had been submitted to it, including plaintiff.

22. Nine persons were nominated by the nominating committee for election to the Board at the annual election on March 1, 1971. The nominations by the committee did not include plaintiff.

23. On February 1, 1971, the committee on elections reported that it had received and accepted the nomination of Cameron for Chairman of the Board and the nomination of Dayton for Vice-Chairman of the Board, to be voted upon at the upcoming election. It also reported that it had received and found eligible the independent nomination of plaintiff for membership on the Board.

24. On February 16, 1971, the time for filing petitions for independent nominations for election to the Board having expired, PBW issued its Circular No. 430 to all of its members, informing them of the names of all nominees for membership on the Board. This notice included the names of the nine persons named by the nominating committee and plaintiff's name, the latter being designated as an independent nominee.

25. On February 16, 1971, plaintiff phoned George S. Hender, secretary of PBW, and stated that he believed that the constitution of PBW required that ten vacancies on the Board, rather than nine, were to be filled by the election of March 1, 1971.

26. If Dayton's elevation to the office of Vice-Chairman of the Board created a tenth vacancy on the Board to be filled at the election of March 1, 1971, plaintiff was certain to be elected a member of the Board.

27. Wetherill dictated a letter dated February 17, 1971, addressed to Hender, containing the resignation of Dayton as Vice-Chairman of the Board, effective that date, and this letter subsequently was signed by Dayton.

28. Wetherill prepared the letter containing the resignation of Dayton "so that there would only be nine vacancies on the Board instead of ten." [N.T. 60].

29. Prior to February 17, 1971, Wetherill and Hender asked J. G. Gordon Yocum, Vice President and General Counsel of PBW, to consider the question of the number of vacancies which existed because he might be asked to render an opinion at the February 17, 1971 meeting of the Board.

30. At the Board meeting held February 17, 1971, there was an extended

discussion concerning whether there were nine or ten positions on the Board to be filled at the forthcoming election.

31. At the February 17, 1971 Board meeting Cameron reported "that he felt that it was not in the best interests of the Exchange for Stanley [plaintiff] to serve as a Board member." [N.T. 84].

32. Various alternatives which could be used in the event it proved undesirable to have plaintiff as a member of the Board were discussed, including removal of a member of the Board for cause.

33. Yocum stated his opinion that only nine vacancies existed on the Board. He said that Dayton had been elected to the Board by a vote of the membership of PBW as a Governor of the class of 1972 and that the Board could not remove Dayton from an office to which the membership of PBW had elected him by designating him as Vice-Chairman of the Board. Yocum said that the only situation in which a person cannot serve both as Vice-Chairman of the Board and as one of the "twenty-four other" members of the Board simultaneously is when he is elected as Vice-Chairman by the membership of PBW. He further stated that he believed that Dayton was a Governor until he died, resigned, was removed for cause, his term expired, or was elected by the membership of PBW as Vice-Chairman.

34. Nonetheless, Yocum suggested that Dayton resign as Vice-Chairman in order to clarify the situation.

35. Dayton's letter of resignation was then presented and accepted by the Board. Dayton also withdrew as the nominee for Vice-Chairman of the Board.

36. The resignation of Dayton as Vice-Chairman at the February 17, 1971 meeting of the Board following his election to that office at the previous Board meeting on January 20, 1971, raised a strong inference that Dayton and other officers and members of the Board believed that Dayton's election as Vice-Chairman ousted him as a member of the Board, thereby creating a tenth vacancy on the Board to be filled at the March 1, 1971 annual meeting.

37. The aforesaid actions of Dayton, Wetherill, Cameron and Yocum and the acceptance of Dayton's resignation by the Board were designed solely to prevent the election of plaintiff to the Board.

38. By letter dated February 19, 1971 to Robert Y. Guarniery, chairman of the committee of elections to the Board, plaintiff requested an opportunity to appear before the committee to present "charges of wrong doing and violation of the Exchange constitution regarding the annual elections of the Exchange." [Pl.Ex. 11].

39. By letter dated February 19, 1971, Guarniery responded to plaintiff's request stating that the report of the committee had been presented to the Board and approved at its February 17, 1971 meeting. Guarniery suggested that plaintiff correspond with the Chairman of the Board concerning any questions he might have.

40. Plaintiff did not correspond with the Chairman of the Board nor did he request to appear before the Board at the meeting of February 17, 1971.

41. The annual election of PBW was held on March 1, 1971, and plaintiff received the least number of votes cast for the ten nominees whose names appeared on the ballot for membership on the Board. Plaintiff received 88 votes; the votes for the other nine nominees ranged from 116 votes to 159 votes.

42. Plaintiff was declared not to have been elected to the Board of PBW at the election on March 1, 1971 and has not been permitted to take office.

## II.

Jurisdiction in this action is based upon §§ 6 and 27 of the Act, 15 U.S.C. §§ 78f and 78aa. Section 27 provides that District Courts shall have exclusive jurisdiction of violations of any duty created by the Act. Section 6 imposes a duty upon an exchange to file the "rules

of the exchange"[1] with the Securities Exchange Commission ("Commission") and abide by and enforce such rules.

Courts have consistently held that the Act imposes a duty upon an exchange to enforce its rules promulgated and filed with the Commission in compliance with section 6(a) (3). Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); O'Neill v. Maytag, 339 F.2d 764 (2 Cir. 1964) (dictum); Baird v. Franklin, 141 F.2d 238 (2 Cir. 1944), cert. den. 323 U. S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944); Kroese v. New York Stock Exchange, 227 F.Supp. 519 (S.D.N.Y.1964); Pettit v. American Stock Exchange, 217 F. Supp. 21 (S.D.N.Y.1963); Butterman v. Walston & Co., Inc., 1967–69 CCH Dec., ¶ 92,102 at 96,515–2 (N.D.Ill. September 9, 1963), aff'd 387 F.2d 822 (7 Cir. 1967), cert. den. 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968).

In Silver v. New York Stock Exchange, *supra*, Justice Goldberg discussed the policy considerations which led to the enactment of section 6 of the Act, saying at 351–352 of 373 U.S., 83 S.Ct. at 1253–1254:

"As exchanges became a more and more important element in our Nation's economic and financial system, however, the private-club analogy became increasingly inapposite and the ungoverned self-regulation became more and more obviously inadequate, with acceleratingly grave consequences. * * * It was, therefore, the combination of the enormous growth in power and impact of exchanges in our economy, and their inability and unwillingness to curb abuses which had increasingly grave implications because of this growth, that moved Congress to enact the Securities Exchange Act of 1934. * * *

Thus arose the federally mandated duty of self-policing by exchanges. In-stead of giving the Commission the power to curb specific instances of abuse, the Act placed in the exchanges a duty to register with the Commission, § 5, 15 U.S.C. § 78e, and decreed that registration could not be granted unless the exchange submitted copies of its rules, § 6(a) (3), 15 U.S.C. § 78f(a) (3), and unless such rules were 'just and adequate to insure fair dealing and to protect investors,' § 6(d), 15 U.S.C. § 78f(d)."

Defendants, however, argue that the instant case is distinguishable from the above-cited cases. They correctly argue that:

1. Section 6(a) (3) requires an exchange to file a copy of its rules with the Commission;

2. Section 6(b) requires that the rules of the exchange contain provisions for the expulsion, suspension, and disciplining of members of the exchange; and

3. *Baird* and its progeny considered only the provisions promulgated pursuant to section 6(b).

But it does not follow that an exchange is under a duty to enforce only those rules filed in compliance with section 6 (b) because neither the statute nor the cases can be construed so narrowly.

Section 6(a) (3) requires that an exchange file with the Commission the rules of the exchange. Section 6(d) provides that an exchange shall be registered "[i]f it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of [the Act] * * * and that the rules of the exchange are just and adequate to insure fair dealing * * *." Although an exchange has great latitude in drafting the rules of the exchange, it must devise some internal controls for governing itself which are then considered by the

---

1. Section 6(a) (3) provides that an exchange shall file with the Commission:

"Copies of its constitution, articles of incorporation with all amendments thereto, and of its existing bylaws or rules or instruments corresponding thereto, whatever the name, which are hereinafter collectively referred to as the 'rules of the exchange' * * *"

Commission pursuant to section 6(d). The requirement that an exchange submit its rules which define its internal organization, then, is no less "mandatory" than the requirement that the rules contain provisions for the disciplining of members. Any other construction of sections 6(a) (3) and 6(d) would produce the anomalous result of permitting an aggrieved member of the exchange to enforce only those provisions of the rules dealing with disciplining of members while rendering meaningless all other requirements of section 6(a) (3). If all that section 6(a) (3) meant was that an exchange should draft rules of the exchange which are incapable of enforcement except at the whim of the exchange itself, there would have been no purpose for its inclusion in the Act. *Cf.* Baird v. Franklin, *supra*. Consequently, it is immaterial whether the rules promulgated and submitted to the Commission pertain to internal organization or the disciplining of members.

In Silver v. New York Stock Exchange, *supra*, Justice Goldberg decried treating exchanges as "private-clubs" which cannot be required to enforce or comply with their own rules. Although *Silver* and *Baird* put an end to the practice of allowing an exchange to arbitrarily enforce or refuse to enforce its regulations regarding the disciplining of members, this, in itself, is insufficient to prevent select members of the financial community from treating the exchange as their private domain. Having drafted rules of the exchange which govern the exchange, the governing body must, to the best of its ability, comply with their provisions. Surely, to do otherwise would not "insure fair dealing" between the exchange and its members.[2]

■ Finally, defendants argue that the Commission does not have the power to curb specific instances of abuse with regard to the rules of the exchange, and, therefore, it follows that the Courts also do not have such power. Section 27, however, provides that District Courts shall have exclusive jurisdiction of violations of any duty created by the Act. It does not provide that jurisdiction is limited to those violations over which the Commission has concurrent jurisdiction and cannot be so read. Jurisdiction of the Commission or lack thereof has no bearing whatsoever upon jurisdiction of this Court pursuant to Section 27.

### III.

Thus, it is immaterial for purposes of jurisdiction under Section 27 of the Act whether or not the Commission has the power to curb specific instances of violations of a duty created by Section 6. Defendants, however, contend that the Commission does have such power and, therefore, plaintiff has failed to exhaust his administrative remedies because he never sought relief from the Commission.

■ Section 19 of the Act, 15 U.S.C. § 78s, defines the powers of the Commission with respect to exchanges. The Commission is authorized to suspend or withdraw the registration of a national securities exchange if it finds that the exchange has violated any provision of the Act or failed to enforce compliance therewith by its members. Suspension or withdrawal of registration is a drastic remedy available only in flagrant cases, and obviously is not an appropriate remedy for plaintiff. Surely, it was not intended that the Act would authorize the Commission to take such extraordinary action in a situation like that of

2. Defendants rely upon Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7 Cir. 1969), cert. den. 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969) and O'Neill v. Maytag, *supra*. Both cases, however, involve actions brought by third-parties against members of the exchange, rather than the exchange itself, for violations of exchange rules. Consequently, these cases do not consider the issues raised by this action. Defendants also rely on Butterman v. Walston & Co., Inc., *supra*. In *Butterman*, the defendant exchange argued that the Court had no jurisdiction to enforce provisions of the constitution. Judge Parsons, however, held that the Court had jurisdiction on other grounds and never reached this question.

plaintiff. The Act did not give the Commission the power to curb specific instances of abuse. Silver v. New York Stock Exchange, *supra*; *see also* II Loss, Securities Regulation, 1172–1178 (1961); Westwood and Howard, Self-Government in the Securities Business, 17 Law and Contemp.Prob. 518 (1952). Thus, plaintiff shall not fail because he did not seek redress of his grievances from the Commission.

Defendants also argue that plaintiff's action should be barred because he failed to exhaust his appeal remedies provided by the PBW constitution. Article XII, Section 1, of the constitution provides for appeals to the Board from a decision of a standing committee by a member of PBW interested therein if he files a written notice of appeal with the secretary of PBW within ten days after the decision has been rendered. It is undisputed that plaintiff did not comply with the technical requirements of Article XII or present his appeal to the Board.

As a general rule, "[c]ourts will not entertain jurisdiction unless all remedies afforded by the by-laws and constitution of an association are exhausted, for it is from them that the rights of the members are derived and determined." Trainer v. International Alliance, etc., 353 Pa. 487, 491, 46 A.2d 463, 465 (1946). But there are, of course, exceptions. "First and foremost, a person will not be required to take intra-association appeals which cannot in fact yield remedies. If a remedy exists in theory only, it can well be considered illusory. Secondly, there is no need for a member to exhaust remedies where the association officials have by their own actions, precluded the member from having a fair or effective trial or appeal. * * * This includes those situations * * * where the association's officials are ob-

viously biased or have prejudiced the member's case before hearing it." Falsetti v. Local Union No. 2026, 400 Pa. 145, 159–160, 161 A.2d 882, 889 (1960).[3]

On February 16, 1971, plaintiff advised the Secretary of PBW, Hender, that he believed that ten, rather than nine, vacancies on the Board were to be filled by the election of March 1, 1971. At the meeting of the Board held the next day, the Board considered plaintiff's contentions and resolved them against plaintiff. Thereafter, plaintiff wrote to the chairman of the committee on elections requesting an opportunity to present charges of violations of the PBW constitution. Plaintiff was advised to correspond with the Chairman of the Board because the committee on elections had disbanded. The Chairman of the Board, however, was opposed to the election of plaintiff to the Board and had played an important role in the determination that ten, rather than nine, vacancies existed on the Board.

Clearly any attempt by plaintiff to exhaust his remedies within PBW would have been futile. The Board had considered his contentions and rejected them. Moreover, the Chairman of the Board was opposed to plaintiff and could not reasonably be expected to fairly adjudicate plaintiff's appeal. Consequently, this action is not barred by plaintiff's failure to exhaust remedies available pursuant to the PBW constitution.

## IV.

Three factors have been considered in order to determine whether defendants failed to follow the constitution of PBW. They are:

1. The interpretation of the constitution relied upon by the Board for

---

3. Federal courts have held that it is unnecessary to exhaust futile remedies in a variety of situations, *e. g.*, Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), (habeas corpus); Montana National Bank of Billings v. Yellowstone County of Montana, 276 U.S. 499, 48 S.Ct. 331, 72 L.Ed. 673 (1928) (assess-

ment of taxes); United States v. Zmuda, 423 F.2d 757 (3 Cir. 1970), cert. den. 398 U.S. 960, 90 S.Ct. 2176, 26 L.Ed.2d 545 (1970) (selective service); Spanish International Broadcasting Company v. FCC, 128 U.S.App.D.C. 93, 385 F.2d 615 (1967) (intervention).

the proposition that nine, rather than ten, vacancies on the Board were to be filled at the annual election of March 1, 1971;

2. The events which led to the adoption of the interpretation by the Board; and

3. The motivation of the Board.

Regardless of whether any of these factors, considered independently, could sustain a finding that defendants violated a duty created by Section 6 of the Act, the totality of circumstances produces the inevitable conclusion that defendants failed to abide by the constitution and insure fair dealing with its members.

Article II, Section 1, of the constitution provides for a Board of Governors " * * * consisting of the Chairman of the Board of Governors, the Vice-Chairman of the Board of Governors, the President of the Exchange, twenty-four *others* elected to the office of Governor, * * *." (Emphasis added)

Plaintiff contends that the above-quoted section prevents the Chairman, Vice-Chairman, or President from serving as one of the twenty-four "others" elected to the office of Governor. Under this construction of Article II, Dayton was automatically ousted as one of the twenty-four others elected to the Board when he was elevated to the office of Vice-Chairman by the Board on January 20, 1971. Consequently, a tenth vacancy for the office of Governor was created. Moreover, plaintiff contends, once this vacancy was created, it was immaterial that Dayton resigned as Vice-Chairman. Having been automatically removed from the office of Governor, Dayton could not be reinstated except by election, either by the Board or by the membership. It is undisputed that Dayton was never re-elected as a member of the Board. Plaintiff supports his interpretation of Article II with the past history of PBW. At the annual election in March, 1970, George DeB. Bell, a Governor of the class of 1972, was elevated to the office of Vice-Chairman by the membership. Thereafter, the Board elected Allen

Weintraub to fill the vacancy created by Bell's elevation. Plaintiff contends that the present interpretation of Article II by the Board is inconsistent with its election of Weintraub in 1970 and clearly indicates that defendants are presently refusing to abide by the constitution.

Defendants contend that Article II permits a person to serve as both Vice-Chairman and one of the "twenty-four others" simultaneously when that person is elevated to the office of Vice Chairman by the Board. The phrase "twenty-four *others* elected to the office of Governor", then, applies only when the election is by the membership. Defendants argue that Dayton was not elected by the membership and, therefore, is not precluded from serving in a dual capacity. Under this interpretation of Article II, the elevation of Dayton is distinguishable from that of Bell. Bell was elected by the membership to the office of Vice-Chairman and a vacancy resulted, however, Dayton was elected by the Board to the office of Vice-Chairman and no vacancy resulted. In any event, defendants argue, even if Dayton was automatically ousted as a member of the Board when elected to the office of Vice-Chairman, he was reinstated on February 16, 1971 when he resigned as Vice-Chairman.

The interpretation of defendants is unsupported by the constitution of PBW. There is no provision which indicates that election by the Board has less significance or confers fewer powers than election by the membership. Nor does the past history of PBW indicate that election by the membership is sacrosanct while election by the Board is not. Consequently, the Board has created a distinction without a difference. Although Bell and Dayton were elevated to the office of Vice-Chairman by different types of election, there is no basis for distinguishing the results which flow from such election. With regard to the reinstatement of Dayton, there are no provisions which permit a person to serve as a member of the Board other than election by either the membership

or the Board. Apparently, the possibility of reinstatement was not considered at the time the constitution was drafted.

Defendants have engaged in "parliamentary maneuvering" in order to prevent plaintiff's election to the Board. At its February 16, 1971 meeting, the Board considered various alternative solutions to the problem caused by the independent nomination of plaintiff.[4] The possibility of disqualifying plaintiff's nomination was rejected because no constitutional provision justifying such action could be found. One member of the Board suggested that plaintiff could be removed from the Board for cause if elected. Rather than allow plaintiff to be elected unopposed (as he would be if ten vacancies existed), the Board rejected this solution also. The Board ultimately accepted the interpretation of Article II presented by General Counsel although no formal action was taken.

 Finally, the Board was motivated by a desire to prevent the election of plaintiff. Testimony produced at the February 23, 1971 hearing clearly indicates that members of the Board did not consider the election of plaintiff to the Board to be in the best interests of PBW and acted to prevent his election.

As stated in Silver v. New York Stock Exchange, *supra*, 373 U.S. at 349, 83 S. Ct. at 1253:

"Stock exchanges perform an important function in the economic life of this country. They serve, first of all, as an indispensable mechanism through which corporate securities can be bought and sold. To corporate enterprise such a market mechanism is a fundamental element in facilitating the successful marshaling of large aggregations of funds that would otherwise be extremely difficult of access. To the public the exchanges are an investment channel which promises ready convertibility of stock holdings into cash."

Stock exchanges in fact are imbued with a public purpose because of the vital role they play in the economic life of our country, and thus a high standard of conduct may be expected of exchanges in the conduct of their important affairs. The preservation of the integrity of elections, whether conducted by a public or quasi public institution, is indeed basic. Since stock exchanges are quasi public bodies, should they fail in their duty of self regulation to insure fairness and equity in their elections, the courts may step in to protect the public and to preserve the integrity of institutions indispensable to the functioning of our economic system.

The totality of circumstances shows that defendants have attempted to maintain PBW as a private club. Initially, defendants determined that plaintiff should not be permitted to become a member of the Board. Subsequently, defendants devised an *ex post facto* "interpretation" of the constitution in order to justify excluding plaintiff from the Board. This course of conduct was intended to prevent plaintiff from participating in the management of PBW. Not only did defendants desire to retain control over the exchange but they also desired to exclude plaintiff from their councils. Indeed, plaintiff would be but one member of the Board of Governors incapable of controlling actions of the Board. Nonetheless, defendants have gone to great lengths to prevent plaintiff's election. Clearly, defendants' con-

4. It appears that the "problem" was created by the failure of the nominating committee to learn of Dayton's election to the office of Vice-Chairman. When the nominating committee considered persons for nomination, including plaintiff, it was unaware that Dayton had been elevated and, therefore, that the possibility of an additional vacancy existed. Consequently, the nominating committee submitted what it considered to be a full slate of candidates. Had the nominating committee been aware of Dayton's elevation, it is likely that ten persons other than plaintiff would have been nominated. This, however, was not done.

duct maintains PBW as a private club, undermines public confidence in the exchange, fails to insure fair dealing, and violates the duty to abide by the provisions of the PBW constitution.

## V.

 Plaintiff has requested the award of costs and a reasonable fee for his attorney. The absence of express statutory authority and the fact that plaintiff's action did not produce a monetary fund for the benefit of the exchange will not preclude such an award for plaintiff. If some benefit is conferred upon the exchange or its members, plaintiff then is entitled to reimbursement for costs and payment of reasonable compensation to his attorney. *See generally* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The proper conduct of the March 1, 1971 election of PBW and the salutary effects thereof confers a type of benefit upon the exchange and its members. Further, plaintiff's action contains an unusual if not unique set of facts that may not occur again. Thus, plaintiff will be awarded costs and a reasonable attorneys fee.

## CONCLUSIONS OF LAW

1. Jurisdiction is based upon the Securities Exchange Act of 1934, as amended, §§ 6 and 27, 15 U.S.C. §§ 78f and 78aa.

2. There are no administrative remedies with the Securities Exchange Commission available to plaintiff.

3. Plaintiff need not exhaust remedies provided by the PBW constitution which would be an exercise in futility.

4. Defendants have failed to comply with the provisions of the PBW constitution in violation of a duty created by Section 6 of the Act.

5. It is appropriate for this Court to provide suitable relief.