**NEW YORK STOCK EXCHANGE, INC., et al., Plaintiffs,**

v.

**Fergus M. SLOAN, Jr., et al., Defendants.**

No. 71 Civ. 2912.

United States District Court, S. D. New York.

May 2, 1975.

Milbank, Tweed, Hadley & McCloy, New York City, for plaintiffs.

Morrison, Paul, Stillman & Beiley, New York City, for defendant J. Antonio Zalduondo.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant Fergus M. Sloan, Jr.

Robinson, Silverman, Pearce, Aronsohn, Sand & Berman, New York City, for defendants Alfred E. Frisbie, Charles R. Grandy, Ralph A. Musil, Otto J. Sell, John W. Thomas.

Sidney Kramer, New York City, for defendant Donald L. Kamensky.

Whitman & Ransom, New York City, for defendant Peter J. Wiley.

Fuller, Lawton & Moyles, P. C., New York City, for defendant Richard Forbes.

Hawkins, Delafield & Wood, New York City, for defendants Paul B. Haggarty, Victor J. Tournet, George C. Vrattos.

Robert H. Kreutzer, New York City, for defendant William F. Wiese.

Spengler, Carlson, Gubar & Churchill, New York City, for defendant Rita Anderson.

Balterman & Geist, New York City, for defendant Marcel Clamons.

Butowsky, Schwenke & Devine, New York City, for defendant Thomas C. Kilduff.

Sidney Eagle, New York City, for defendant Ruth Button.

Flemming & Zulack, New York City, for defendant Frank E. Doggrell, Jr.

Gold, Farrell & Marks, New York City, for defendants R. P. and Eleanor F. Clinton.

Robert S. Groban, New York City, for defendant August Mezzetta.

Hallisey & Goldberg, New York City, for defendant Carl W. Anderson.

Kraft & Hughes, Newark, N. J., for defendants Donald Eucker and John J. Villani.

Manning, Carey, Redmond & Tully, New York City, for defendant James S. Shields.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Robert Vesco.

David Rubin, New York City, for defendant Herbert R. Johnson.

Sullivan Donovan, Hanrahan, McGovern & Lane, New York City, for defendant Clifford G. Doerle.

## MEMORANDUM OPINION

LASKER, District Judge.

This suit raises novel questions as to the scope of liability of the New York Stock Exchange ("Exchange") under § 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f. In June 1970, Orvis Brothers & Co., a member firm of the Exchange, commenced liquidation after a period of financial deterioration. The Exchange brings this action to recover some $5,000,000. expended from its Special Trust Fund to compensate public customers of Orvis for the losses which resulted. Defendants are a varied group including the general and limited partners of Orvis, certain of its subordinated lenders and its accountants.

The amended complaint charges that Orvis failed to keep accurate books and records and concealed the precarious financial condition of the firm until May, 1970, in violation of the rules and regulations of the Exchange and the Securities Exchange Act of 1934. It further claims that the general and limited partners and subordinated lenders of Orvis conspired to enable the firm to continue in business, despite its failure to meet Exchange net capital requirements, by improperly overstating Orvis' net capital position at the time of an audit of the firm. Finally, the complaint alleges that two subordinated lenders received a preferential transfer of securities at a time when the firm was insolvent.

All but one of the defendants have answered the amended complaint. Sixteen of the defendants counterclaim against the Exchange for loss of their investments in the firm, charging that the Exchange failed to perform its statutory duty under § 6 to make and enforce Exchange rules, particularly Rule 325, the net capital rule. They claim that the Exchange knew or should have known of Orvis' financial difficulties and alleged violations of Exchange rules as early as 1968, but that it adopted a policy of not enforcing or selectively enforcing its rules with regard to Orvis. They further allege that the Exchange permitted Orvis to continue in business despite its poor financial condition without disclosing to defendants (most of whom claim they were merely "passive" investors not involved in the management of the firm) its knowledge of that condition.

The Exchange moves for partial summary judgment dismissing the counterclaims described, contending that partners, limited partners and subordinated lenders of a member firm do not have standing to assert a violation of § 6. The Exchange has submitted no factual material in support of the motion other than the two page affidavit of its counsel and the four page affidavit of an official of the Exchange.[1] These explain the thrust of the present motion,

---

[1]. Photocopies of the counterclaimants' applications for Exchange approval are annexed to these affidavits.

but do not state facts relating to the events leading up to Orvis' liquidation. Some of the counterclaimants have filed affidavits which raise genuine issues of fact as to whether they were partners or lenders to Orvis at the relevant time. Because these affidavits would in any event require denial of the motion for summary judgment as to the counterclaimants submitting them, and the Exchange's reply papers make clear that its attack is directed at the pleadings, we treat the present motion as arising under Rule 12(c). Such a course is proper for the additional reason that summary judgment should be used sparingly in complex lawsuits which, like the present one, raise novel questions of law. Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948); Eccles v. People's Bank of Lakewood Village, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784 (1948).

### I.

Analysis of the question of standing to sue under § 6[2] begins with Baird v. Franklin, 141 F.2d 238 (2d Cir.) cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L. Ed. 591 (1944), in which the existence of a private right of action under that section was first recognized. In *Baird,* a member of the Exchange converted the securities of one of its public customers. The Exchange had notice of the conversion, but took no disciplinary action against the member. Although the panel spoke with one voice in holding that the customer had a right of action against the Exchange for dereliction of its § 6 duties, the majority held that she had failed to prove that the Exchange's conduct caused her loss. The opinion of Judge Clark, who dissented from the result, presents the court's view as to the implication of a private action under § 6:

"There can be no doubt that § 6(b) places a duty upon the Stock Exchange to enforce the rules and regulations prescribed by that section. Any other construction would render the provision meaningless . . . Sections 6(b) and (d) were surely intended to be read together, and the latter makes it clear that the purpose of the requirements of the former is 'to insure fair dealing and to protect investors.' This can be realized only if § 6(b) is construed as imposing the two fold duty upon an exchange of enacting certain rules and regulations

2. Section 6 of the Exchange Act provides, in relevant part:
   "Sec. 6(a) Any exchange may be registered with the Commission as a national securities exchange under the terms and conditions hereinafter provided in this section, by filing a registration statement . . . containing the agreements, setting forth the information, and accompanied by the documents, below specified:
   (1) An agreement . . . to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this title, and any amendment thereto and any rule or regulation made or to be made thereunder;
   (2) Such data as to its organization, rules or procedure, and membership, and such other information as the Commission may by rules and regulations require as being necessary or appropriate in the public interest or for the protection of investors;
   \*      \*      \*      \*      \*

   (b) No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of trade
   . . .
   (c) Nothing in this title shall be construed to prevent any exchange from adopting and enforcing any rule not inconsistent with this title and the rules and regulations thereunder and the applicable laws of the State in which it is located.
   (d) If it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange."

and of seeing that they are enforced." 141 F.2d at 244.

■ For purposes of the present motion, *Baird* is as important for what it did not decide as for what it did. There can be no doubt after *Baird* that public customers of a member firm are entitled to sue the Exchange for violation of § 6.[3] However, few courts have been faced with the question, left open in that case, whether those in the position of the present counterclaimants have a similar right, and none has definitively determined it.

In Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963), corporate reorganization trustees sued the Exchange, among others, alleging a conspiracy to defraud a corporation of 587,000 shares of unregistered stock by distributing it through the facilities of the Exchange in a rigged market. In addition to their § 10(b) claims plaintiffs alleged that the scheme could not have been accomplished if the Exchange had properly carried out its § 6 duties. In moving to dismiss the § 6 claim, the Exchange argued that the statute is designed solely to protect public customers. The court rejected that contention, observing without further discussion that ". . . the statutory scheme should not be so restricted where, as here, the loss to the corporation arises from a fraudulent transaction in its securities which is successfully perpetrated through the conduct of the Exchange." 217 F.Supp. at 29.

In holding that those standing in the shoes of public investors, such as corporate reorganization trustees, are entitled to sue under § 6, *Pettit* broadened the *Baird* rule somewhat. However, the trustees in *Pettit* were not members of the Exchange "community," as are the partners or subordinated lenders of a member firm. The Exchange argues on the present motion that, for purposes of § 6, such "insiders" of the Exchange community are a different species than public customers or their representatives; it claims that § 6 was intended to protect only the latter.

The few cases which have dealt with the issue cast some doubt on this contention. In Weinberger v. New York Stock Exchange, 335 F.Supp. 139 (S.D.N.Y. 1971), a former limited partner of Ira Haupt & Co. sued the Exchange for the loss of his investment in the firm. He claimed, among other things, that it had failed adequately to supervise Haupt with regard to the latter's extension of credit to a vegetable oil refining company. As Haupt discovered too late, the company had supplied fake warehouse receipts as collateral and Haupt was soon afterward adjudicated a bankrupt.

The three-year limitations period applicable to actions for breach of a duty created by statute would have barred a claim based directly on § 6. Accordingly, plaintiff, as an alleged "investor" in Haupt, sought recovery as a third-party beneficiary of the "contract" between the SEC and the Exchange, by which the latter agreed to make and enforce rules "appropriate for the protection of investors."[4] Relying on Baird v. Franklin, the court observed that "the policy of federal law . . . makes an investor more than an incidental beneficiary of the contract mandated by [§ 6]" and held that plaintiff was entitled to sue for its breach. 335 F.Supp. at 144.

However, in so holding, the court decided only that the intended benefi-

---

3. A number of courts have followed *Baird* in holding that public customers of member firms can sue the Exchange for violation of § 6. See, e. g., Marbury Management, Inc. v. Kohn, 373 F.Supp. 140 (S.D.N.Y.1974); Rich v. New York Stock Exchange, CCH Fed.Sec.L.Rep. ¶ 94,736 (S.D.N.Y.1974); Steinberg v. Merrill Lynch, Inc., CCH Fed.

Sec.L.Rep. ¶ 94,599 (S.D.N.Y.1974); Butterman v. Walston & Co., 387 F.2d 822 (7th Cir. 1967); Hochfelder v. Midwest Stock Exchange, CCH Fed.Sec.L.Rep. ¶ 94,498 (7th Cir. 1974).

4. See § 6(a)(1) quoted in note 2, *supra*.

ciaries of the agreement between the Exchange and the SEC have a right of action based upon it. cf. Baird v. Franklin, 141 F.2d at 244. It did not decide whether plaintiff, who as noted above was a limited partner, was in fact within the benefited class—an inquiry as crucial to a determination of standing in an action based on contract as one based on a statute. See Restatement of Contracts § 145 (1932), Fata v. S. A. Healy Co., 289 N.Y. 401, 46 N.E.2d 339 (1943); United States ex rel. Johnson v. Morley Const. Co., 98 F.2d 781, 788–789, (2nd Cir.); Lemon v. Bossier Parish School Board, 240 F.Supp. 709, 713 (W. D.La.1965), aff'd, 370 F.2d 847 (5th Cir. 1967). Indeed, the Exchange appears to have made only the general argument that no action based on contract existed; it did not press for the distinction, as it does here, between "public investors," who arguably are the sole beneficiaries of the contract or statute, as the case may be, and Exchange "insiders," whom it claims are not.

The question of standing to assert a violation of § 6 was more squarely raised in Hughes v. Dempsey-Tegeler, Inc., 1973 CCH Fed.Sec.L.Rep. 94,133 (C.D.Cal.1973). Hughes, a subordinated lender to Dempsey, suffered a loss when the firm was liquidated. For some time prior to liquidation, Dempsey had been in violation of the net-capital rule. The Exchange had at times imposed restrictions on the firm, but permitted it to count as "good" capital certain unregistered stock. Hughes claimed, among other things, that the Exchange violated § 10(b) and § 6 both in approving Hughes' subordination agreement with Dempsey when it knew of Dempsey's poor condition, and in failing to suspend the firm. In discussing whether Hughes had standing to assert his claims, the court did not distinguish between the requirements for standing under § 10(b), which are embodied in the "in connection with" language of that

section itself, and the requirements under § 6, which of course contains no specific criterion for standing. Instead the court held that a subordination agreement meets the definition both of an "investment contract" and an "evidence of indebtedness," 15 U.S.C. § 77b(1), 15 U.S.C. § 78c(a)(10). The determination that the subordination agreement was a security was in the court's view, dispositive of the issue of Hughes' standing to assert a violation of both § 6 and § 10(b). Satisfied that Hughes met the relatively restrictive requirements for standing under the anti-fraud provisions, the court appears to have assumed he also met the somewhat hazier requirements of *Baird* and *Weinberger*. 1973 CCH Fed.Sec.L.Rep. at 94,538–539.

## II.

Although the cases discussed suggest that the class entitled to sue under § 6 is not limited to public customers of member firms, they are not dispositive of the precise issue before us: the question whether Exchange "insiders" may sue was not squarely before the courts in *Weinberger* and *Pettit*, and the *Hughes* court did not analyze the particular requirements for standing to sue under § 6, as distinguished from § 10(b).

Further analysis of the issue compels an inquiry into the legislative purpose undergirding § 6. The Exchange argues that the legislative history of the Act indicates that Congress was concerned exclusively with the protection of public investors. There is no doubt that this was a primary purpose of the Act, whose text and legislative history are sprinkled with frequent references to "investors."[5]

However, the fact that the Act manifestly seeks to protect public customers does not mean that their protection was Congress' exclusive concern. Indeed, both the preamble to the Exchange Act and the language of § 6 preclude such a

5. See Senate Report No. 792, 73rd Cong., 2d Sess., House Report No. 1383, 73rd Cong., 2d Sess.

construction. Section 2 of the Act, 15 U.S.C. § 78b, states:

".  .  . transactions in securities .  .  . are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto .  .  . and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit .  .  . and to insure the maintenance of fair and honest markets in such transactions.

Similarly, the language of § 6 speaks in broad terms of Exchange rules "necessary or appropriate in the public interest or for the protection of investors," (§ 6(a)(2)) and "just and adequate to insure fair dealing." (§ 6(d))

The view that the purposes of § 6 extend beyond the protection of public investors is supported by other authorities. In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389, rehearing denied, 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963), non-member broker-dealers claimed that the Exchange's unilateral determination that member firms discontinue private wire connections with them constituted a group boycott in violation of the antitrust laws. In considering the nature of the "federally mandated duty of self-policing by exchanges" the court took a broad view of § 6. 373 U.S. at 352–355, 83 S.Ct. at 1254. After finding that the

Exchange was empowered to regulate relationships between non-members and members, it held that petitioners—who were neither public customers nor Exchange members—had standing to complain of the manner in which the Exchange applied its rules as to them.[6]

In Bright v. Philadelphia-Baltimore-Washington Stock Exchange, 327 F. Supp. 495 (E.D.Pa.1971) a member of the Exchange sued under § 6, claiming that the Exchange had failed to comply with its own rules in conducting an election for membership on its board of governors. The Exchange argued that *Baird* and *Silver* recognized the right to sue stock exchanges only for violation of rules promulgated pursuant to § 6(b), which requires the making of rules providing for the disciplining of members; and not for violation of rules made under § 6(a)(3), which pertain to the internal organization of the exchange. In rejecting the argument, the court observed:

"The requirement that an exchange submit its rules which define its internal organization .  .  . is no less 'mandatory' than the requirement that the rules contain provisions for the disciplining of members. Any other construction of sections 6(a)(3) and 6(d) would produce the anomalous result of permitting an aggrieved member of the exchange to enforce only those provisions of the rules dealing with disciplining of members while rendering meaningless all other requirements of section 6(a)(3). If

---

**6.** The Exchange argues that *Silver* is not controlling here because, as a case brought under the antitrust laws, it sheds no light on the question who has standing to assert a violation of § 6. But this is too narrow a reading of the court's decision. Although the case is analytically distinguishable from one arising under the Exchange Act, there can be no question after *Silver*, if there was prior to it, that those in the position of the petitioners there can sue under § 6 itself for violation of the statutory command that Exchange rules "insure fair dealing:"

"Rules which regulate Exchange members' doing of business with nonmembers

.  .  . are therefore very much pertinent to the aims of self-regulation under the 1934 Act .  .  . In light of the important role of exchanges in our economy and the 1934 Act's design of giving the exchanges a major part in curbing abuses by obligating them to regulate themselves, it appears conclusively .  .  . that the rules applied in the present case are germane to performance of the duty, implied by § 6(b) and § 6(d), to have rules governing members' transactions and relationships with nonmembers." (373 U.S. at 355–356, 83 S.Ct. at 1256.)

all that section 6(a)(3) meant was that an exchange should draft rules of the exchange which are incapable of enforcement except at the whim of the exchange itself, there would have been no purpose for its inclusion in the Act. Cf. Baird v. Franklin . . . ." 327 F.Supp. at 502.

## III.

■ Taken together, *Bright, Silver* and *Baird* undercut the Exchange's argument here that the scope and purposes of § 6 should be narrowly construed. Rules made pursuant to § 6 are intended not merely to protect public investors (as in *Baird*) but to effect the comprehensive scheme of self-regulation envisioned by Congress. Accordingly, members of the Exchange community who are intended to be benefited by such rules (as in *Bright*) or who are "swept into the currents of self-regulation" (as in *Silver*) have standing to complain of the manner of their enforcement.

■ Nevertheless, although it is clear that standing to sue under § 6 is not restricted merely to public customers, it does not follow, as counterclaimants contend, that every person who is arguably affected by the Exchange's performance of its duties may sue under the statute. The cases discussed recognize that § 6 mandates the making of several types of Exchange rules,[7] some of which impose duties on the Exchange itself (as in the conduct of elections) and others which impose duties on member firms (for example, the "know your customer rule"). Because these rules vary in purpose and are intended to protect different interests, the determination whether a given person has standing to sue the Exchange for its failure adequately to enforce them does not and should not hinge on the categorical approach urged by the parties. cf. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969); Colonial

Realty Corp. v. Bache & Co., 358 F.2d 178 (2d Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1967). To the contrary, the requirements for standing should be flexible enough to take account of the nature and intent of the particular Exchange rule whose violation is the subject of suit.

Although the courts in *Baird, Silver* and *Bright* did not explicitly engage in an inquiry of this sort, their holdings are readily explicable in such terms. In *Bright,* for example, the rules governing the conduct of elections imposed a duty on the Exchange itself to follow certain procedures for the benefit of those competing for office and the "electorate" itself, i. e., Exchange members. To hold that only public customers could sue under § 6 for breach of the election rules would have made little sense; their stake in the enforcement of those rules is simply not as great as that of Exchange members.

In the present case, the counterclaimants assert that the Exchange failed adequately to supervise Orvis' compliance with its violations of the net capital and recordkeeping rules of the Exchange. These rules, which relate to the financial soundness of member firms, are manifestly intended to protect those who entrust their funds or securities to broker-dealers, and who stand in the kind of relationship to the firm which requires them to rely on its compliance with the rules. The *Baird* court found that public customers clearly fall into this category; in our view, the same rationale applies to limited partners and subordinated lenders. For the reasons detailed below, we find that the Orvis limited partners and subordinated lenders are investors in "securities" within the meaning of the securities laws, and that this factor alone entitles them to sue under § 6 on the facts alleged. We further find that even if their interests in the firm do not constitute securities, they nevertheless have standing. No

---

7. So much is clear from the language of the statute. Compare, e. g., § 6(a)(2), 6(a)(3), 6(b), 6(c).

matter how their investment in the firm is characterized, they clearly have a large stake in the enforcement of the rules. Because their status requires them to rely on the general partners both to manage the enterprise and to comply with the net capital and record-keeping rules, they are entitled to the Exchange's diligent enforcement of them. It follows that they may sue the Exchange for its failure to perform that duty.

Conversely, as discussed below, general partners are not investors in "securities" because the success of their enterprise depends wholly on their own efforts. Moreover, the particular Exchange rules involved in the present lawsuit are not designed to protect them but rather to govern their conduct for the benefit of third parties. The Exchange cannot have failed to enforce the rules unless the general partners failed in the first instance to comply with them, and we believe for the reasons set forth below, that to permit them to assert their counterclaims would do violence to the statutory scheme.

#### IV.

We agree with the court in Hughes v. Dempsey-Tegeler, Inc., *supra*, that, at least for purposes of the present motion, subordinated lenders are "investors" in Orvis. The definition of a security as set forth in § 2(1) of the Securities Act of 1933 (15 U.S.C. §

77b(1)) and § 3(a)(10) of the Exchange Act of 1934 (15 U.S.C. § 78c(a)(10)) includes "any . . . investment contract." The Supreme Court has defined such contracts as any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." SEC v. W. J. Howey Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). A subordination agreement meets this test because it subjects the securities of the lender to the claims of creditors in exchange for the payment of interest by the borrower; and the continuing payment of interest to him depends wholly on the efforts of the borrower, in this case, Orvis.

Moreover, because a subordination agreement establishes the borrower's obligation to pay interest for the use of securities, it is also an "evidence of indebtness" under §§ 2(1) and 3(a)(10). See United States v. Jones, 450 F.2d 523, 525 (5th Cir. 1971); Farrell v. United States, 321 F.2d 409, 417 (9th Cir. 1963), cert. denied, 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478 (1964).

We also find that, at least for purposes of a motion for judgment on the pleadings, limited partners are investors in "securities," because their legal status with regard to a member firm is markedly similar to that of an equity shareholder.[8] See Klebanow v. N.Y.

---

8. The Supreme Court has consistently given a broad reading to the definition of a security in § 2(1) of the Securities Act, SEC v. W. J. Howey, *supra*, and § 3(a)(10) of the 1934 Act, Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); and instructed that "in searching for the meaning and scope of the word 'Security' . . . form should be disregarded for substance and the emphasis should be on economic reality." *Id.* at 336, 88 S.Ct. at 553. Although we do not and need not hold that every limited partnership interest in a member firm is a "security" for all purposes under the securities laws, we note that such authority as exists on the subject supports our conclusion in the present case. See Pawgan v. Silverstein, 265 F.Supp. 898, 900

(S.D.N.Y.1967); Bolger v. Lavanthal, Krekstein, Horvath & Horvath, 381 F.Supp. 260 (S.D.N.Y.1974); Weinberger v. N.Y. Stock Exchange, *supra*, 335 F.Supp. at 146. The SEC defines the term "equity security" (for purposes of §§ 12(g) and 16 of the Exchange Act, 15 U.S.C. §§ 78*l*(g), 78p, which deal with registration requirements for securities) to include any "limited partnership interest." 17 C.F.R. § 240.3(a)11–1. We note that statutes permitting limited partnerships were intended to encourage investment in business enterprises by affording limited partners a status similar to that of an equity shareholder. Ruzicka v. Rager, 305 N.Y. 191, 197–198, 111 N.E.2d 878, 881 (1953).

Produce Exchange, 344 F.2d 294, 297–298 (2d Cir. 1965). The limited partnership agreement of Orvis indicates, consistent with New York Partnership Law, McKinney's Consol. Law, c. 30, that the liability of limited partners is restricted to the amount of their capital contribution; and, more important in relation to the present subject, that they "shall not take any part in the management of the business nor act for the partnership." These factors bring a limited partnership interest within the definition of an investment contract in §§ 2(1) and 3(a)(10), since under New York law a limited partner is by definition a "passive" investor whose profits, if any there be, result solely from the efforts of the general partners. SEC v. W. J. Howey Co., *supra*, 328 U.S. at 298–299, 66 S.Ct. 1100.

■ The Exchange argues, nevertheless, that subordinated lenders and limited partners of member firms are, like general partners, charged with compliance with § 6 and rules made pursuant to it,[9] and that it would mock the statutory scheme to "allow a member who is part of the entity charged with the duty of enforcement to assert a violation of that duty."[10] Although, as discussed below, the argument is dispositive of the question whether general partners have standing to assert their counterclaims, we do not agree that limited partners and subordinated lenders are in fact charged with the duty to enforce Exchange rules. Section 6(a)(1) makes it the duty of the Exchange to "comply, and to enforce so far as is within its powers compliance by its *members*, with the provisions of [the Act]" (emphasis supplied). A "member" is defined in § 3(a)(3), 15 U.S.C. § 78c(a)(3) as:

". . . any person who is permitted either to effect transactions on the exchange without the services of another person acting as broker, or to make use of the facilities of an exchange for transactions thereon without payment of a commission or fee, . . . and includes any firm transacting a business as broker or dealer of which a member is a partner, and any partner of any such firm."

Because the quoted language indicates that subordinated lenders are not "members" by any construction, it is clear that they are not charged with the enforcement of Exchange rules.

As to limited partners, the language is cloudy but no case of which we are aware supports the Exchange's view that the phrase "any partner" was in-

---

9. The Exchange points to the fact that its rules require that prospective limited partners and subordinated lenders, as well as general partners, apply to the Exchange for approval of their affiliation with a member firm; and to submit themselves to Exchange jurisdiction for disciplinary proceedings. The Exchange Constitution provides (at Article XIV) that applications for affiliation with a member firm may be denied, or the affiliate suspended or expelled, if he has made a material misstatement in connection with his application for approval by the Exchange. However, although applicants for subordinated lender or limited partner status are under a duty to comply with these rules, they are under no such duty with regard to the record-keeping and net-capital rules.

As a general proposition, it is questionable indeed whether the Exchange, by requiring compliance with a given set of rules (e.g. those governing application for affiliate sta-

tus), can unilaterally transform a person into an "insider" who is responsible for supervising compliance by third-parties with every rule of the Exchange; and then argue that he is precluded from suing under § 6 by reason of his guardianship. In fact, the argument is undercut by the Exchange's own procedures for approval of affiliations, which differentiate between general partners on one hand, and limited partners and subordinated lenders on the other. An applicant for general partnership is required to pass a written "allied member" examination; to swear that he is familiar with Exchange rules; and to pledge to abide by them. These procedures are not required for other applicants, whom the Exchange does not treat as prospective "allied members."

10. See plaintiff's memorandum in support of motion, p. 36.

tended to include limited partners.[11] Although the question is debatable, it seems more reasonable to interpret the term as referring to general partners only. Such a construction is suggested by basic principles of partnership law. General partners are of course agents of the partnership, and the acts of any of them (regarding, for example, compliance or non-compliance with Exchange rules) bind the partnership itself. This being so, "any [general] partner" is quite literally a "member" of the Exchange for all practical purposes. The case is quite different, however, as to limited partners, who are disenfranchised by statute from taking part in the management of the business, or binding the partnership. N.Y. Partnership Law, § 99. It is unlikely that Congress intended by the phrase "any partner" to brush aside, without specific provision to that effect, the significant distinctions between limited partners and general partners classically embodied in state law. Accordingly, we conclude that the reference in § 6(a)(1) to "members" includes only the latter.

■ The Exchange argues nevertheless that there is "no need to give counterclaimants . . . power to bring a private action"[12] to effectuate the purposes of the Act because the Securities Exchange Commission is charged with the responsibility to supervise and discipline the exchanges. The argument comes late in the day. As the court noted in Baird v. Franklin, the Commission's powers under §§ 19(a)(1) and 32 of the Act (which provide for certain punitive sanctions against an exchange) do not "inure at all to the benefit of the defrauded investors . . . while they may be of benefit to future investors, they do nothing for those who have already been the victims of over-reachings." 141 F.2d at 245. Moreover, as the *Silver* Court observed, the Commission does not have the power "to review particular instances of enforcement of exchange rules." 373 U.S. at 357, 83 S.Ct. at 1257.

■ The Exchange contends next that the Securities Investor Protection Act (SIPA), enacted in 1970, evinces the intention of Congress to protect only public customers, and not affiliates of member firms. See 15 U.S.C. § 78fff(c)(2)(A)(ii). However, the fact that Congress has given special protection to public customers through the "insurance" feature of SIPA does not suggest that it intended to leave persons affiliated with broker-dealers without a remedy under other provisions of the Act. Indeed, to the extent that policy considerations are relevant, we note that the insurance provisions of SIPA obviously reduce the motivation of customers of insolvent broker-dealers to sue the Exchange for breach of its § 6 duties. The absence of interested private parties may in some cases have the effect of insulating the Exchange from the consequences of its own negligence.[13] In such circumstances, recognition of a private action by limited partners and subordinated lenders not only provides a remedy for investors with a large financial

---

11. The Exchange does not suggest that limited partners fit within the alternative definition of a "partner" contained in § 3(a)(3), as persons permitted to effect transactions on the Exchange without the payment of a commission.

12. Private actions have been recognized as a salutary device for effectuating the purposes of the Act. See Baird v. Franklin, *supra*, 141 F.2d at 244–245; J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.

Ed.2d 423 (1964); SEC v. Texas Gulf Sulfur Co., 401 F.2d 833 (2d Cir.), cert. denied sub nom., Coates v. SEC, 394 U.S. 796, 89 S.Ct. 1454, 22 L.Ed.2d 756 (2d Cir. 1968).

13. We note that some of the counterclaimants charge that the Exchange has compensated public customers of Orvis out of the Special Trust Fund without testing the validity of their claims, in an effort to avoid multiple lawsuits and limit the extent of its liability.

stake in their firm, but promotes the remedial purposes of the Act.[14]

## V.

■ The reasons for the conclusion that general partners do not have standing to sue under § 6 are essentially the obverse of those which support a cause of action for limited partners and subordinated lenders.

Most of the general partner-counterclaimants assert that they were essentially "passive" investors in Orvis. However, general partners are not investors in "securities," even under the relatively expansive construction the courts have applied to the definitions contained in §§ 2(1) and 3(a)(10). The record does suggest that at Orvis (as is common practice in partnerships) the day-to-day management of the firm was conducted by a relatively small group of general partners. In our view, however, the determination whether the partnership interest of a general partner is a security does not and should not hinge on the particular degree of responsibility he assumes within the firm. The fact that a partner may choose to delegate his day-to-day managerial responsibilities to a committee does not diminish in the least his legal right to a voice in partnership matters, nor his responsibility under state law for acts of the partnership. See N.Y. Partnership Law §§ 10, 11, 26. These factors critically distinguish the status of a general partner from that of the purchaser of an investment contract who in law as well as in fact is a "passive" investor.

Moreover, there is nothing in the statute to suggest that Congress intended general partners to be the beneficiaries —as "investors" or otherwise—of the Exchange's duty under § 6(a)(1) to "comply, and to enforce *so far as is within its powers compliance by its members*, with . . . any rule . . . made [by the Exchange]" (emphasis added). To the contrary, the quoted language indicates that members (which, as noted above, include general partners, see § 3(a)(3)) are responsible in the first instance for complying with the rules which the Exchange has made in order to regulate the conduct of their business. As to Orvis' alleged violation of the record-keeping and net-capital requirements of the Exchange, the language of § 6(a)(1) makes clear that the Exchange is not charged with the duty of omnicompetence, nor with the duty to perform for Orvis the responsibilities which Orvis was unable or unwilling to perform for itself; its only duty is to enforce the rules "so far as is within its powers." In the case of the general partners, who were jointly and severally

---

14. It is reasonable to assume that prospective limited partners and subordinated lenders will be more inclined to invest in member firms if they can be confident that the Exchange is properly fulfilling its supervisory role. Investment in member firms is, of course, crucial to their liquidity and there is no question that a large group of viable member firms is the core concept of national securities exchanges. Cf. Gordon v. New York Stock Exchange, 498 F.2d 1303, 1305–1309 (2d Cir. 1974). Accordingly, to permit investors in member firms to sue the Exchange for failure to "safeguard" their investment not only encourages such investment but promotes the overall purpose of the Act to provide an essentially self-regulating public market for securities investors. We further note that there is some evidence of the need for more effective supervision of the Exchange's performance of its duties under § 6. A congressional investigation of the state of the securities industry during the period 1967–70, when some 170 brokerage firms failed, concluded:

> "The Subcommittee's hearings show concretely that the [New York Stock] Exchange's failings [to enforce its rules as to member firms] were one of the major causes of the operational and financial breakdowns which constituted the 1967–70 crisis in the securities business." Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, Securities Industries Study, H.R.Rep.No.92–1519, 92nd Cong. 2d Sess. VIII (1972).

Specifically, the study noted that both the net capital rule "and its enforcement proved sorely deficient when financial responsibility was tested," and stated that there was "grave doubt" about the Exchange's "respect for its statutory obligations." *Id.* at 93–94.

responsible for compliance, the Exchange cannot have been remiss in its duty to enforce compliance with the rules in question unless the rules had first been violated. To permit the general partners to sue the Exchange in such circumstances would turn the Act on its head.[15]

Our conclusion that general partners may not sue the Exchange for failure to enforce rules whose observance is their own responsibility is amply supported by the general policies of the Act. As the *Silver* Court observed, a securities exchange is simply the aggregate of its members, 373 U.S. at 350, 83 S.Ct. 1246. It is of course central to the concept of self-regulation that member firms conduct themselves in accordance with rules promulgated by their governing body. To permit suit by general partners in cases like the present one would do nothing to encourage their careful observance of the rules. To the contrary, it would tend to concentrate the responsi-

bility for compliance—and the legal consequences of non-compliance—on a relatively small number of partners, and dilute the protection which the scheme of self-regulation extends to those with a far greater need for it. Even "passive" general partners are on notice, under hornbook law, that they are bound by the acts of their partners. We see no reason why Congress would have intended to grant them a remedy against the Exchange when the remedy more properly lies against the offending co-partner.[16]

## VI.

■ Some of the counterclaimants argue that regardless whether they have a private right of action against the Exchange under § 6, they may nevertheless sue for tortious violation of the statute or, as in *Weinberger*, for breach of the agreement between the Exchange and the SEC to supervise member firms. As to the limited partner and subordinated

15. In so holding, we do not suggest that those named in this suit as general partners are barred from suing the Exchange under § 6 for alleged misconduct directed at them at a time when they were "investors." Cf. Danford v. Schwabacher, 342 F.Supp. 65 (N.D.Cal.1972), appeal dismissed, 488 F.2d 454 (9th Cir. 1973); Laupheimer v. McDonnell & Co., Inc., 500 F.2d 21 (2d Cir. 1974). However, determination of the particular status of a given counterclaimant and the state of the Exchange's knowledge of Orvis at the relevant times obviously raises complex factual issues which cannot be determined on the present motion.

16. Defendant-counterclaimants cite Seligson v. New York Produce Exchange, 378 F.Supp. 1076 (S.D.N.Y.1974) for the proposition that general partners may assert their counterclaims against the Exchange because they have as great a right as investors to be protected by the Exchange's supervision. The case does not control here. Seligson, like Weinberger v. New York Stock Exchange, *supra*, arose out of the "salad oil swindle." Plaintiff, the trustee in bankruptcy of Haupt, sued the Produce Exchange for its failure to carry out its statutory duty to maintain an orderly market and prevent manipulation and cornering of the market. 7 U.S.C. § 7(d). Haupt had taken an extraordinarily large position in cottonseed oil futures on behalf of its customers which, unfortunately for Haupt, had supplied fake

warehouse receipts as collateral. The Produce Exchange moved for summary judgment, arguing that a member-broker could not sue the Exchange for failure to regulate its own wrongful conduct. In denying the motion, the court noted that the losses which Haupt sought to recover were directly related to the sharp plunge in the cottonseed oil market; and that the history and language of the Commodity Exchange Act indicated Congress' intention to impose on the Exchange an express duty to maintain an orderly market. Moreover, the trustee alleged that the Exchange intentionally failed to perform its duties in order to benefit those holding "short interests" to the detriment of "long interests," principally Haupt. 378 F.Supp. at 1082–1086.

These factors distinguish *Seligson* from the present case. The scheme of regulation set forth in § 7(d) of the Commodity Exchange Act contemplates a far more active role for the Exchange in the everyday operation of the market than does the Securities Exchange Act. Moreover, the allegations of the Trustee in *Seligson* that the Exchange intentionally failed to correct market conditions make that case more closely analogous to one arising under § 10(b) of the Exchange Act than one under § 6. In view of these facts, and the different statute, legislative history and factual background involved, *Seligson* is not applicable in the present case.

lender counterclaimants, we need not reach the question, other than to note that *Weinberger* suggests at the very least that they may sue on a contract theory. As to general partners the proper test is the same as that applied earlier in relation to standing to assert claims based directly on the statute: that is, whether general partners are within the class intended to be benefited by the Exchange's statutory duty, or the "contract," as the case may be. See Restatement of Contracts, § 145 (1932); Restatement of Torts 2d, § 286 (1965).[17] It would be anomalous to hold that the statute provides greater relief indirectly than that it provides directly, and we decline to do so. In accordance with our finding that § 6(a)(1) does not impose any duty on the Exchange for the benefit of general partners as to the particular rules involved in this suit, we further hold that they have no independent cause of action based on tort or contract.

In view of the foregoing, the Exchange's motion for judgment on the pleadings as to the counterclaims based on § 6 is granted as to the general partner-counterclaimants and denied in all other respects.

It is so ordered.

---

17. See the discussion of Weinberger v. New York Stock Exchange, *supra.*