**Donald M. COLLINS, Trustee of Albert & Maguire Securities Co., Inc., Debtor,**

v.

**PBW STOCK EXCHANGE, INC., et al.**

**Civ. A. No. 75–2930.**

United States District Court, E. D. Pennsylvania.

Feb. 18, 1976.

**1346**

Donald M. Collins, Philadelphia, Pa., for plaintiff.

Judith R. Cohn, Franklin Poul, Philadelphia, Pa., for defendants.

### MEMORANDUM

GORBEY, District Judge.

Defendants have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint on the ground that plaintiff, Trustee of the Estate of the debtor, lacks standing to bring this action.

This case is a civil action brought under § 6 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78f and § 9(c) of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78iii(c), the rules and regulations of the Securities and Exchange Commission, and common law principles.

The complaint alleges that the defendant PBW Stock Exchange, Inc. (hereinafter referred to as "Exchange") is a National Securities Exchange registered with the Securities and Exchange Commission, and it has filed with the Commission its rules and exchange practices which are required to be adequate to protect investors. The debtor was a member of the Exchange during the time relevant to the complaint, and in accordance with § 9(c) of the Securities Investor Protection Act, defendant Exchange had the responsibility for the examination of the compliance by the debtor with applicable financial responsibility rules.

The other defendants are members of the Business Conduct Committee of the defendant Exchange and are, therefore, charged with the duty of enforcing the Exchange rules concerning financial responsibility and § 9(c) of the Securities Investor Protection Act.

The first cause of action rests upon the allegation that, at the time the defendants became aware that the liability limit on the debtor's fidelity bond was $100,000 below the amount required by the rules of the Exchange, the defendants had known for a long period of the managerial and financial difficulties of the debtor and of the incompetence and inexperience of its employees, but nevertheless negligently failed to require compliance.

The second cause of action rests upon the allegation that when defendants concluded that the management of the debtor was inadequate to administer the existing affairs of the debtor, they forbade the opening of any new branch offices. Nevertheless, defendants did nothing to prevent the opening of debtor's New York branch, which because of faulty control, defalcations in excess of $600,000 occurred within the short space of two months and which were the immediate cause of the debtor's insolvency. Such loss is alleged to be the result of defendants' negligence. Defendants assert, however, that the losses suffered were the result of the negligence of the officers of the bankrupt debtor, that any cause of action was owned by the debtor prior to the Trustee's appointment, therefore the doctrine of estoppel is applicable.

In the memorandum in support of defendants' motion to dismiss, defendant points out at page 2, footnote 1:

"We know of no case based on the failure of an exchange to enforce its discretionary order such as the one alleged in the complaint relating to branch offices, or any case against individual members of an exchange for failure of the exchange to enforce rules." [1]

Objection based on the lack of an exact precedent reminds one that "after the Norman Conquest all ordinary actions were begun by a writ issuing from the King, and ordering the defendant to be summoned before the court to answer the plaintiff. These writs were issued as a matter of course, in the various well-

---

1. At page 3 of defendants' reply memorandum it is stated that: "Plaintiff cites no case in which it has been held that an Exchange member can itself complain of the failure of the Exchange to compel the member to obey an Exchange rule." If so, that is not the end for the court, but is only the beginning.

known actions from which they took their name. These were writs of debt and of covenant; there were writs of trespass for forceable injuries to the plaintiff's person, or to property in his possession, and so on. *But these writs were only issued for the actions which were known to the law, and without a writ the court had no authority to try a case.* (Emphasis supplied) "Those forms had ceased to be adequate. Thus there were many cases which did not exactly fall within the definition of a trespass, but for which it was proper that a remedy should be furnished. In order to furnish a remedy, the first thing to be done was to furnish a writ. Accordingly, the famous statute of 13 Edward I., c. 24, authorized the official from which the old writs issued to frame new ones in cases similar in principle to those for which writs were found, and requiring like remedy, but not exactly falling within the scope of the writs already in use." *The Common Law,* by Oliver Wendall Holmes, Jr., p. 274.

Even a casual study of the cases under our system of government shows that courts have not shrunk from their responsibility to deal with new and novel problems, whether the common law or statutory law has been involved, and have established precedents where none existed before, some to be overturned and others to be affirmed by the appellate courts. As a consequence it becomes quite obvious that: "The truth is, that the law is always approaching, and never reaching consistency", and "the history of what the law has been is necessary to the knowledge of what the law is". Id., pp. 36, 37. Thus "It cannot be helped, it is as it should be that the law is behind the times, but the law embodies beliefs that have triumphed in the battle of ideas". Attributed to Justice Holmes in Volume 47, Oklahoma Bar Journal, page 47. In this battle, counsel for opposing litigants are, of course, indispensable parties. Thus it is very apparent that Mr. Holmes was opposed to the idea that: "Law was a symmetrical structure of logical propositions, all neatly dovetailed. The truth or error, the rightness or wrongness of a judicial decision could be determined by merely checking to see whether it fitted into the symmetrical structure; if it fitted, it was right; if it did not fit, it was wrong, and could, or at least should be disregarded." *Gilmore, Legal Realism: Its Causes and Cure,* 70 Yale L.J. 1037, 1038 (1961).

Granted that one of the primary purposes of Congress in enacting the Securities Exchange Act of 1934 was to protect the general investing public, the logical first step in the judicial process was taken in the determination that an implied right of action arose under § 6(b) in favor of customers of the defaulting brokerage house, thus allowing a direct action by the injured investor and recovery against an Exchange whose breach of duty was a proximate cause of the loss.

Since the greatest possibility of loss to an investing public would result from the insolvency of the corporate brokerage house, brought about by violation of the rules of the Securities Exchange Act and the rules and regulations of the Exchange, it would not be inconsistent with the purpose of the statute to conclude that the Exchange, in the interest of customers, has a duty to member firms to enforce the pertinent rules in order to prevent violations by officers and directors of the brokerage firm which, as a corporation, although having an identity separate and distinct therefrom, can act only through its agents. Having found such a duty, the next logical step is to conclude that the insolvent corporation has a right of action against those whose breach of duty was the proximate cause of the corporation's loss. "The business of the jurist is to make known the contents of the law; that is, to work upon it from within, or logically, arranging and distributing it, in order from its *summum genus* to its *infima species,* so far as practicable. Legal duties then come before legal rights . ·. . " *The Common Law, supra,* p. 219.

It is not believed that the cases require the conclusion that although an Exchange owes duties to an investor, that it owes no affirmative duties to a brokerage firm even though it has knowledge of improper conduct by those through whom and by whom the corporate entity is acting, and the additional knowledge that unless it discharges the duties created upon it by virtue of the contract with the Securities and Exchange Commission, the resulting injury to the corporation will likely result in injury to the investing public.

To imply a right in favor of the corporation after having concluded that the Exchange owes a duty to the corporation, an entity apart from its unfaithful officers and its stockholders, could hardly be condemned as a dilution of the protection to which investors have been found to be entitled under the Act. On the contrary, it would be an added stimulus to both the Exchange and its Business Conduct Committee to be diligent in the discharge of their respective obligations.

It will also be recalled that the "assault on the citadel of privity" culminated in success when courts found valid reasons for permitting suits by third-party beneficiaries despite the lack of privity. A similar victory is recorded in the case law of torts. *McPherson v. Buick Motor Company,* 217 N.Y. 382, 111 N.E. 1050 (1916).

Recent cases involving the "implied right technique" to federal statutes silent on the point, are: *Thompson v. Washington,* 162 U.S. App.D.C. 39, 497 F.2d 626 (1973); *Marshall v. Lynn,* 497 F.2d 643 (U.S.App.D.C. 1973); *Tenants' Coun. of Tiber Island-Carrollsburg Sq. v. Lynn,* 162 U.S.App.D.C. 61, 497 F.2d 648 (1973). *Note dissenting opinion,* pp. 653–654.

Research for the solution of the issue raised in this case must, of course, begin with the landmark case of *Baird v. Franklin,* 141 F.2d 238 (2d Cir. 1944) in which it was held that § 6 of the Exchange Act may be the basis for a suit against an exchange by members of the investing public. Subsequently it was held in *Pettit v. American Stock Exchange,* 217 F.Supp. 21 (S.D.N.Y.1963) that a bankruptcy trustee of a corporation whose shares were sold on the American Stock Exchange could maintain an action against the Exchange. In *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), it was determined that a non-member of a stock exchange, in an antitrust case, had standing to complain of the manner in which the Exchange rules applied to them.

In *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), a private suit for damages for a violation of the Federal Securities Acts and Regulations thereunder was allowed. Thereafter, in 1966, Judge Friendly's dictum in *Colonial Realty Corporation v. Bache & Co.,* 358 F.2d 178 (2d Cir. 1966), laid the foundation for subsequent decisions that private liability for a violation of some exchange rules may be implied. *Avern Trust v. Clarke,* 415 F.2d 1238 (7th Cir. 1969).

In *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (1969), the Seventh Circuit upheld the right of a Trustee in bankruptcy of a securities dealer to bring a § 6 action based upon a violation of the "know your customer" rule. In so doing, the court explicitly rejected the contention that the Trustee was barred from recovering by the responsibility of the bankrupt principal for the illegal transaction.

The question was raised, but not decided by the Third Circuit in 1973, in *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139.

In *New York Stock Exchange, Inc. v. Sloan,* 394 F.Supp. 1303, 1309, footnote 6 (S.D.N.Y.1975), it was said of the *Silver* case, *supra*:

"Although the case is analytically distinguishable from one arising under the Exchange Act, there can be no question after *Silver,* if there was prior to it, that those in the position of the petitioners there can sue under § 6 itself for violation of the statutory command that Exchange rules 'insure fair dealing'."

In the *Sloan* case the court stated at page 1313:

"The absence of interested private parties may in some cases have the effect of insulating the Exchange from the consequences of its own negligence. In such circumstances, recognition of a private action by limited partners and subordinate lenders not only provides a remedy for investors with a large financial stake in their firm, but promotes the remedial purposes of the Act."

■ Thus, the approach to the problem of standing to sue has been progressive, not retrograde. The test of standing as developed by the cases is whether the party asserting a cause of action is within the class intended to be benefited by the Exchange Act, regulations thereunder, and the rules of the Stock Exchange itself. With this background we pass to the issues raised in the case *sub judice.*

■ The estoppel argument being raised on a motion to dismiss may be disposed of on two grounds, the first of which is that under Federal Rule of Civil Procedure 8(c) it is an affirmative defense the efficacy of which cannot be determined until all the facts are developed by an evidentiary hearing.

■ Also, when the objectives of the Securities laws are considered, it is illogical to conclude that estoppel is an absolute defense where violations of § 6 of the Exchange Act are involved.

■ With respect to estoppel it may be said that there is no difference in principle between it, on the one hand, and unclean hands and *in pari delicto* on the other. With respect to the latter, it has been held that

"their application rests with the discretion of the court . . . The question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public." *Kuehnert v. Texstar Corp.,* 412 F.2d 700, 704 (5th Cir. 1969).

While the court, for reasons of policy, held the defenses to be valid, in another case six years later the same court declined, where § 10(b) of the Exchange Act was involved, to allow the defense of *in pari delicto. Woolf v. Cohn & Co.,* 515 F.2d 591 and 521 F.2d 225, 1976 C.C.H. Fed.Sec.L.Rep. ¶ 95–223, ¶ 95,359 (5th Cir. 1975).

Since the public policy behind § 10(b) and § 6 of the Exchange Act is identical, the words of the court have special significance to the case *sub judice.*

"Moreover, because of the twofold purpose of the implied private rights of an action that have grown up around the securities acts deterrence of violations and compensation of those who have suffered pecuniary loss attributable to violations, the degree to which the defendant's unlawful activity affects the investing public must be given substantial weight in determining whether to permit interposition of the in pari delicto defense." Id., 515 F.2d at page 604, at page 98, 157.

Furthermore, it is to be noted that plaintiff in his complaint has characterized debtor's agents as being inexperienced and incompetent, and yet with knowledge that the rules of the Exchange were being violated defendants did not take steps to see that its rules with respect to the broker's blanket bonds were enforced, nor did it attempt to preclude the opening of an office in New York in violation of its unrescinded order.

■ Considering the responsibility and trust imposed by Congress in the Exchange and its employees, in protecting the investing public, and conceding improper conduct by the debtor's agents, it appears that the fault of the parties,

while mutual and simultaneous is not "relatively equal", a requirement for the application of the *in pari delicto* doctrine. *Woolf v. Cohn & Co., supra,* 515 F.2d 591, 1976 CCH Fed.Sec.L.Rep. at p. 98,157.

■ With respect to the contention of defendants that the plaintiff Trustee has no standing to sue, the defendants however concede that § 6 of the Exchange Act confers a private right of action against Exchanges upon persons intended to be protected by it. In *Baird v. Franklin, supra,* suit was brought by a member of the Exchange; in *Pettit v. American Stock Exchange, supra,* a reorganization Trustee brought an action against the American Stock Exchange, et al., with one count of the complaint charging that the Exchange aided and abetted the conspiracy by failing to adopt and enforce the rules required by § 6 of the Exchange Act. In that case, as here, the Exchange contended that the statute was intended solely to protect investors and could not be utilized to vindicate rights of the corporation that stem primarily from mismanagement of insiders. The court wrote:

". . . As in the case of Section 10(b), however, the statutory scheme should not be so restricted where, as here, the loss to the corporation arises from a fraudulent transaction in its securities which is successfully perpetrated through the conduct of the Exchange."

Id. at page 29.

While in that case the Exchange was relatively blameless, and the officers of the insolvent corporation had devised the fraudulent scheme, the principle established in such case is equally applicable here because the court recognized the standing of the Trustee to sue where there was *a loss to the corporation* from the wrongful acts of the Exchange and others. Since the policy of the Exchange Act is to protect the investing public, it would seem to be unimportant that the wrongful acts of the defendants in that case were insignificant as com-

pared to the conduct alleged in this case, and which, for purposes of a motion to dismiss, is admitted.

Defendants contend that with certain exceptions not here relevant, an ordinary bankruptcy Trustee can pursue only those claims acquired from the debtor, and if a SIPC Trustee has any greater authority it would be only to sue on behalf of the general creditors of the debtor.

■ With respect to the first cause of action, plaintiff has standing as it is a claim of the estate, since the negligence of the defendant did not result in any damage until after the filing date. *Di-Geronimo v. American Company*, 96 F.Supp. 795 (E.D.Pa.1951).

■ It is not necessary, however, for plaintiff to rely on the principle of that case since the conclusion has already been reached that the alleged negligent acts have resulted in the loss to the corporation; the plaintiff Trustee has succeeded to the rights of the bankrupt corporation, and the doctrine of estoppel is not applicable.

The aforementioned conclusions are supported by the excellent memorandum opinion of Judge Lasker of the Southern District of New York, in a case in which the same arguments were presented in support of defendant's motion to dismiss. *Lank v. New York Stock Exchange*, 405 F.Supp. 1031, 71 Civ. 5525, issued December 29, 1975.[2] In that case the receiver of the insolvent brokerage house sued the New York Stock Exchange of which it was a member, alleging a violation of § 6 of the Exchange Act. It was alleged that certain officers and directors of the insolvent brokerage firm had embezzled funds belonging to it and otherwise participated in violations of the rules of the exchange; also that the Exchange knew or should have known, prior to liquidation, that the firm was in violation of various Exchange rules,

"and that if the Exchange had fulfilled its obligations under § 6 to enforce compliance with the securities laws and its own rules, the losses suffered by (the member's) customers, subordinated lenders, shareholders and creditors who advanced money subsequent to (the date the Exchange knew or should have known of such violations) would have been prevented".

Id., p. 1033.

There, as here, defendant Exchange contended that

"its duties under § 6 run only to public customers of Exchange members and that in any event, (the receiver of the member) would have no authority to assert such a claim because (the member) was the primary wrongdoer in the whole affair. To allow the Receiver, i. e. the corporation, to bring this action would be 'tantamount to permitting the robber to sue the policeman for not catching him before he had a chance to rob' ".

Since the court in a prior case had found that the Exchange's duties under § 6 ran to limited partners and subordinated lenders as well as to public cus-

---

2. In defendants' supplemental memorandum it is stated at page 4: "There are two basic difficulties with plaintiff's position: (1) the fact that the broker cannot sue for its own violation of a rule and (2) the fact that the broker is not a person within the protection of Section 6 for whom an implied cause of action can be created. As to the first, the *Lank* opinion offers neither logic nor authority for its expansion of the rights of the trustee. As to the second, the *Lank* opinion shows no awareness of the problem."

(1) and (2) are not facts; they are simply the defendants' conclusions with respect to the issue involved. The court disagrees with the implication that the opinion in *Lank* was writ-

ten by Judge Lasker with no awareness of the problem.

In defendants' supplemental memorandum, at page 1, defendants state: "Furthermore the corporation is not an investor entitled to the protections of the Securities laws." It seems reasonable to conclude that when a brokerage house buys stock in its own behalf it can be regarded as an investor.

It is also stated in the aforementioned memorandum at page 2 that: "The decision in *Lank* does not follow from *New York Stock Exchange, Inc. v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y.1975)." With respect to this conclusion it seems sufficient to note that Judge Lasker is the writer of both opinions.

tomers, and that they, therefore, had standing to sue the Exchange for failure to enforce compliance with its own rules, *New York Stock Exchange v. Sloan, supra,* the court concluded that:

"The same reasoning supports an action by a corporation, at least where, as here, the action is asserted by a receiver in liquidation. A corporation, like the customers, subordinated lenders and limited partners of a brokerage firm, is required by its status to rely on those responsible for the management of the firm to comply with the net capital rule and is therefore entitled to the Exchange's diligent enforcement. A brokerage corporation as an entity is more than its officers and directors."

Id. at p. 1037.

With respect to the receiver's claim the court stated:

". . . the defendants bear responsibility for the loss to the corporation and those who would benefit from the suit bear none."

Id. at p. 1037.

Also:

"A trustee in bankruptcy, or a receiver, should be allowed to employ all the legal tools at his command to pursue assets and claims of the corporation against those who share some legal responsibility for the corporation's downfall."

Id. at p. 1038.

After a review of the cases, the court concluded that it has been established, directly or by analogy, that the defense of estoppel or "in pari delicto" is not allowed because it would be contrary to the policy which underlies both the Commodities and the Securities Exchange Acts, a policy which places heavy reliance on enforcement and self-regulation of the Exchanges for the protection of investors. Accordingly, the court held that a claim had been stated under § 6 and that the receiver of the insolvent brokerage house had standing to sue for damages sustained by the insolvent brokerage house.

Having concluded that plaintiff in the case *sub judice* has stated a claim against the defendant Exchange for negligence in not enforcing its own rules, in conformity to the policy of the Exchange Act which places heavy reliance on enforcement and self-regulation for the protection of the investors, who, of course, may suffer as a consequence of an injury to the brokerage firm, it follows that some responsibility should be shared by any individual who may have assumed a special obligation to the defendant Stock Exchange to see that its obligations to enforce § 6 of the Exchange Act, and the rules of the Exchange itself, are discharged.

In Section 5 of the Complaint, it is alleged that:

"The individual defendants were members of the Business Conduct Committee ('Committee') of the Exchange at all relevant times. The Committee, pursuant to Exchange Rule 700, was the mechanism by which the Exchange administered the duties imposed by Section 9(c) of the SIPC Act and the Exchange rules concerning the financial responsibility of the members of the Exchange, including Exchange Rule 705 relating to fidelity bonds."

Had the individual members of the Business Conduct Committee of the Exchange not been derelict with respect to the enforcement of relevant rules, the Exchange would not be a defendant. It is here because the Committee was allegedly negligent. It follows, therefore, that heavy reliance on enforcement and self-regulation by the Exchange which is the policy of the Exchange Act, will be stimulated, rather than thwarted, by permitting the corporation, or its trustee in case of bankruptcy, to pursue a claim against such individuals as being among those who share some legal responsibility for the corporation's downfall.

Although not necessary to the resolution of the issue in this case, individual liability also exists because by accepting membership on the "Committee" the individual members impliedly, if not expressly, promised the Exchange to ad-

minister the relevant duties imposed on it by both the Securities Exchange Act as well as its own rules. Since the policy behind the Securities Act is protection of the investor, such a promise must be interpreted as a promise not only for the benefit of the promisee Exchange but also for the benefit of members of the Exchange; creditor beneficiaries under the terminology of the Restatement of Contracts, § 133, and intended beneficiaries under the terminology of the Restatement of Contracts 2d, § 133. Such a promise is, therefore, an asset of the bankrupt brokerage house and therefore available to the Trustee in bankruptcy. *Compare Weinberger v. New York Stock Exchange,* 335 F.Supp. 139 (S.D.N.Y. 1971).

No opinion is here expressed as to the merits of plaintiff's case; only for the purpose of the motion to dismiss for lack of standing do we accept as true the allegations of the complaint. Accordingly, the defendants' motion to dismiss is denied.